Jay C. ROBERTS and Maureen M. Roberts, Plaintiffs,

v.

SMITH BARNEY, HARRIS UPHAM & CO., INC., Defendant.

Civ. A. No. 86–1344–S.

United States District Court, D. Massachusetts.

Dec. 11, 1986.

David F. Cavers, Jr., Robert W. Holmes, Jr., Powers & Hall, P.C., Boston, Mass., for plaintiffs.

Gerald F. Rath, James P. Delphey, Bingham, Dana & Gould, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND DEFENDANT'S MOTION TO DISMISS OR TO COMPEL ARBITRATION

SKINNER, District Judge.

Plaintiffs Jay C. Roberts and Maureen M. Roberts (the "Roberts") reside in Vermont where they own and operate a sheep breeding business. Defendant Smith Barney, Harris Upham & Co., Inc. ("Smith Barney") is a New York based investment and brokerage house with offices throughout the country. The Roberts bring this action against Smith Barney to recover damages allegedly caused by Smith Barney's mishandling of the Roberts' securities trading accounts.

Plaintiffs allege the following: In April, 1983, Edward L. Diener, a Smith Barney employee working out of the company's office in Boca Raton, Florida, telephoned the Roberts at their home. He told the Roberts that he could increase their investment income if they opened trading accounts with him. In mid-July, the Roberts signed a number of agreements, including a Smith Barney, Harris Upham & Co., Inc. Securities Account Agreement (the "Securities Account Agreement"), and a Smith Barney, Harris Upham & Co., Inc. Commodity Customers Agreement (the "Commodity Customers Agreement"), and by September they had transferred to Smith Barney money and securities worth approximately $310,500. Diener opened three trading accounts in the Roberts' names over which he exercised complete control. The Roberts allege that between July, 1983 and May, 1985, Diener traded excessively in the accounts, incurring large loan and transaction fees on "in and out" trades, failed to inform the Roberts of his activities, failed to obtain the Roberts' permission for many trades, made misleading statements about the trades and the state of the Roberts' accounts, and made trades inconsistent with the Roberts' expressed investment objectives. In May, 1985, Diener sold all the securities in the Roberts' accounts causing them to lose substantial amounts of money.

Plaintiffs have brought this suit to recover damages allegedly caused by Smith Barney's mishandling of their trading accounts. Smith Barney moves to dismiss all counts of the Complaint. In the alternative, Smith Barney seeks an order compelling arbitration of the claims. Plaintiffs request permission to submit an Amended Complaint and oppose defendant's motions to dismiss and to compel arbitration.

*Plaintiffs' Motion to File an Amended Complaint*

■ Plaintiffs may file their Amended Complaint. The Amended Complaint contains copies of account statements for some of the transactions upon which plaintiffs base their claims. It also revises Count IV dealing with alleged RICO violations to reflect the First Circuit's recent decision in *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986). The *Schofield* case, which clarifies the requirements for civil RICO violations, was decided after plaintiffs filed their original Complaint. Plaintiffs have made this motion to amend early in the proceedings, and Smith Barney will not suffer any prejudice from the amendment. Therefore, plaintiffs' motion to file an Amended Complaint (the "Complaint") is ALLOWED.

*Defendant's Motion to Dismiss*

The Complaint contains seven counts alleging violations under:

(I) Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder;

(II) Section 15(c)(1) of the Act, 15 U.S.C. § 78o(c)(1), and Rules 15cl–2, 17 C.F.R. § 240.15cl–2, and 15cl–7, 17 C.F.R. § 240.15cl–7, promulgated thereunder;

(III) Section 20 of the Act, 15 U.S.C. § 78t;

(IV) the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961–1968;

(V) The Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1–26;

(VI) common law negligence, and

(VII) common law fraud and misrepresentation.

Smith Barney moves to dismiss Count IV (RICO) and Count II (Section 15(c)(1)) of the Complaint on the grounds that they fail to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). In addition, Smith Barney moves to dismiss all of plaintiffs' claims for failure to plead with particularity the circumstances of the alleged fraud. *See* Fed.R.Civ.P. 9(b).

## RICO

Count IV of the Complaint alleges that Smith Barney violated sections 1962(a) and 1962(c) of RICO and asks for civil damages under section 1964 of the statute. *See* 18 U.S.C. §§ 1962(a) and (c), 1964. Smith Barney contends that Count IV must be dismissed because plaintiffs' allegations of a single criminal scheme fail to allege a "pattern of racketeering activity." Plaintiffs respond that they have alleged numerous related criminal acts by Smith Barney and that the statute requires no more.

■ To prove a RICO violation, plaintiffs must show, among other things, that Smith Barney engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962; *Sedima, S.P.R.L. v. Imrex Company, Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The RICO statute does not fully define the phrase "pattern of racketeering activity"; it states merely that "a pattern of racketeering activity requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). As the Supreme Court

has noted, this definition provides only the necessary condition for finding a pattern of racketeering activity and does not imply that two acts of racketeering activity are always sufficient to form a pattern.

> [T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added) not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient.

*Sedima,* 105 S.Ct. at 3285 n. 14. The statute leaves to the courts the task of determining what constitutes a sufficient condition of a pattern of racketeering activity.

Before 1985, the lower courts had generally not vigorously enforced the pattern requirement. However, in 1985, the Supreme Court indicated that civil RICO had been extended beyond its appropriate scope, in part because the lower courts had failed to construe the pattern requirement as restrictively as Congress had intended.

> We ... recognize that in its private civil version, RICO is evolving into something quite different from the original conception of its authors.... The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of pattern.

*Id.* 473 U.S. at 500, 105 S.Ct. at 3287, 87 L.Ed.2d at 361. This dicta by the Supreme Court has provoked a range of responses from the lower courts.

■ A few courts have continued after *Sedima* to hold that any two related acts of racketeering activity constitute a pattern. *See R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985); *Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494, 497 (N.D.Ill.1985). I find this approach inadequate. The Supreme Court appeared to reject this concept of pattern in *Sedima* because it fails to take into ac-

count Congress' intent that RICO should reach only continuous criminal activity. *See Sedima,* 105 S.Ct. at 3285 n. 14, 3287. Congress made clear in the legislative history that " 'the "pattern" element of the statute was designed to limit its application to planned, ongoing, continuous crime as opposed to sporadic, unrelated, isolated criminal episodes.' " *Id.* 473 U.S. at 527, 105 S.Ct. at 3289, 87 L.Ed.2d at 378 (Powell, J., dissenting) (quoting Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 72 (1985)). As the Senate Report stated:

> The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern.

S.Rep. 91–617, 91st Cong. 1st Sess. 158 (quoted in *Sedima,* 105 S.Ct. at 3285 n. 14). Holding that any two related acts constitute a "pattern" reads the continuity factor out of RICO and allows the statute to apply to sporadic, noncontinuous activity. Thus, this relaxed reading of the pattern requirement is inadequate.

At the other end of the spectrum are those courts which have held that the pattern requirement is met only where a defendant's criminal acts are committed in furtherance of two or more separate criminal schemes or episodes. *See Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir. 1986); *Holmberg v. Morrisette,* 800 F.2d 205, 210 (8th Cir.1986); *B.J. Skin & Nail Care, Inc. v. International Cosmetic Exchange, Inc.,* 641 F.Supp. 563, 566–567 (D.Conn.1986); *Zahra v. Charles,* 639 F.Supp. 1405, 1408–1409 (E.D.Mich.1986); *Clodfelter v. Thuston,* 637 F.Supp. 1034, 1039–1040 (E.D.Mo.1986); *Madden v. Gluck,* 636 F.Supp. 463, 465 (E.D.Mo.1986); *Papai v. Cremosnik,* 635 F.Supp. 1402, 1412–1413 (N.D.Ill.1986); *Agristor Leasing v. Meuli,* 634 F.Supp. 1208, 1225–1226 (D.Kan.1986); *Frankart Distributors v. RMR Advertising, Inc.,* 632 F.Supp. 1198, 1200–1201 (S.D.N.Y.1986); *Phelps v. Wich-*

*ita Eagle-Beacon,* 632 F.Supp. 1164, 1171–1172 (D.Kan.1986); *Grant v. Union Bank,* 629 F.Supp. 570, 578 (D.Utah 1986); *Fleet Management Systems, Inc. v. Archer-Daniels-Midland Co., Inc.,* 627 F.Supp. 550, 559–560 (C.D.Ill.1986); *Medallion TV Enterprises, Inc. v. SelecTV of California, Inc.,* 627 F.Supp. 1290, 1297 (C.D.Cal.1986); *Allington v. Carpenter,* 619 F.Supp. 474, 478 (C.D.Cal.1985); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.,* 616 F.Supp. 1418, 1421–1422 (W.D. Okla.1985); *Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831–833 (N.D.Ill.1985); *Garbade v. Great Divide Mining and Milling, Inc.,* 645 F.Supp. 808 (D.Colo.1986).

■ The multiple scheme or episode requirement takes account of the need for continuity in a civil RICO defendant's criminal activities. However, it is overly restrictive. I can conceive of situations where a single scheme of criminal activity, if ongoing and far-reaching, might warrant the application of RICO. Because the two scheme or episode requirement might prevent the use of RICO in such a case, it strikes me as too restrictive. In addition, I do not find the two scheme or episode requirement to be analytically useful. It is not immediately apparent to me what activities constitute a single scheme or episode; some courts seem to treat an episode as almost equivalent to a single act of racketeering activity, *see Papai,* 635 F.Supp. at 1412–1413, while others obviously view a scheme as some kind of far ranging, multi-act, criminal plot. *See Superior Oil Co.,* 785 F.2d at 257.

■ A number of courts have taken a middle position between holding that any two acts may constitute a pattern and holding that a pattern requires acts in furtherance of multiple schemes. *See Schaafsma v. Marriner,* 641 F.Supp. 576, 579 (D.Vt. 1986); *Temporaries, Inc. v. Maryland National Bank,* 638 F.Supp. 118, 120–125 (D.Md.1986); *Trak Microcomputer Corporation v. Wearne Brothers,* 628 F.Supp. 1089, 1095–1096 (N.D.Ill.1985); *Graham v.*

*Slaughter,* 624 F.Supp. 222, 224–225 (N.D. Ill.1985); *Eastern Corporate Federal Credit Union v. Peat, Marwick, Mitchell & Co.,* 639 F.Supp. 1532 (D.Mass.1986); *Anton Motors, Inc. v. Powers,* 644 F.Supp. 299 (D.Md.1986); *Bear Creek Productions, Inc. v. Saleh,* 643 F.Supp. 489 (S.D.N.Y. 1986). These courts leave open the possibility of finding a pattern based upon a single criminal scheme and generally focus their inquiry on the individual factors evincing continuity of criminal activity. This approach strikes an appropriate balance between RICO's role as a flexible tool for discouraging criminal activity and the danger of allowing it to reach sporadic and isolated criminal activities. It also avoids the use of conclusory labels and focuses the inquiry directly upon the question of what constitutes continuous criminal behavior. I conclude that the appropriate method for determining whether plaintiffs have alleged a pattern of racketeering activity is to focus on the specific factors evincing continuity of criminal activity.

■ Among the factors I must consider to decide whether plaintiffs have alleged continuous racketeering activity by Smith Barney are (1) the number of independent victims of the alleged activity, *see Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322 (7th Cir.1986); *Schaafsma v. Marriner,* 641 F.Supp. at 581; *Torwest DBC, Inc. v. Dick,* 628 F.Supp. 163, 166 (D.Colo.1986); *Bear Creek Productions,* 643 F.Supp. 489 (2) the number of participants in the alleged crime, *see Schaafsma,* 641 F.Supp. at 581; *Torwest,* 628 F.Supp. at 166, (3) the purpose of the activity, *see Schaafsma,* 641 F.Supp. at 581, *Torwest,* 628 F.Supp. at 166, *Gidwitz v. Stirco, Inc.,* 646 F.Supp. 825 (N.D.Ill. 1986), (4) the result of the activity, *see Schaafsma,* 641 F.Supp. at 581; *Torwest,* 628 F.Supp. at 166, (5) the method of commission, *see Schaafsma,* 641 F.Supp. at

581; *Torwest,* 628 F.Supp. at 166; (6) the number of transactions, *see Professional Assets Management,* 616 F.Supp. at 1471–1477; *Eastern Corporate Federal Credit Union,* 639 F.Supp. 1532 (7) whether the scheme is ongoing and open ended, *see Anton Motors,* 644 F.Supp. 299; *Lipin Enterprises,* 803 F.2d 322, and (8) the duration of the activity. *See Bank of America National Trust & Savings Loan Association v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir.1986); *Zahra,* 639 F.Supp. at 1409. A consideration of these factors indicates that plaintiffs have failed to allege a "pattern of racketeering activity."

■ The Roberts are the only victims of the alleged scheme.[1] The sole participant was a single broker at Smith Barney. The purpose and result of the alleged activity was quite specific, to defraud these plaintiffs, and the alleged method of commission was at all times the same, the churning and manipulation of their trading accounts. And while the plaintiffs allege numerous criminal acts by Smith Barney, those acts all arose out of a single contractual transaction, the Roberts' authorization of Smith Barney to trade their accounts. Finally, there are no allegations that this activity is likely to occur in other contexts, or that it will continue to be a threat to society. Nothing in the complaint suggests that the defendant, Smith Barney, regularly engaged in criminal activities. The only factor that favors treating Smith Barney's activities as a pattern is that the alleged activity continued for twenty-two months. However, time alone does not transform Smith Barney's acts into separate, continuous activities. *See Zahra,* 639 F.Supp. at 1406–1409 (activities continuing for seven years not a pattern). In light of the many factors suggesting that Smith Barney did not engage in "planned, ongoing, continuing crime", I find that plaintiffs have failed

---

1. I note that this case is accompanied by a companion case in which plaintiff Jay Roberts' sister, Margot Roberts, seeks damages from Smith Barney for the manipulation of her trading accounts. I do not consider Jay and Margot Roberts to be separate victims for purposes of this analysis. Jay Roberts began trading

through Diener pursuant to Margot Roberts' suggestion. Both the Roberts traded the same securities. While in one sense they are distinct economic actors, for purposes of assessing whether Smith Barney is engaged in continuous racketeering activity, the Roberts are so closely related as to constitute a single victim.

to allege a "pattern of racketeering activity."

This conclusion is consistent with the policies underlying RICO. At most, plaintiffs allege that Smith Barney committed garden variety securities fraud, a type of case which Congress did not intend that RICO reach. As the Supreme Court has suggested, wire, mail, and securities fraud are unique among the predicate acts covered by RICO. *See Sedima*, 105 S.Ct. at 3287. A single fraudulent event will almost always involve multiple acts of wire, mail or securities fraud. Thus, if the pattern requirement is read too permissively, the courts may sweep into RICO's grasp acts of wire, mail or securities fraud that are merely isolated or sporadic. Insistence upon a genuine pattern of conduct is the appropriate way to prevent such an unwarranted expansion of RICO.

Plaintiffs allege a single fraudulent scheme by one of Smith Barney's brokers. They are the only alleged victims. These allegations do not suggest any continuous criminal behavior on the part of Smith Barney and therefore are insufficient to allege a pattern of racketeering activity. Accordingly, defendant's motion to dismiss Count IV is ALLOWED.

### Section 15(c)(1)

Count II of the Complaint alleges that Smith Barney violated section 15(c)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c)(1), as well as Rules 15c1–2, 17 C.F.R. § 240.15c1–2, and 15c1–7, 17 C.F.R. § 240.15c1–7, promulgated thereunder. Smith Barney moves to dismiss Count II on the grounds that no private right of action exists under section 15(c)(1). Plaintiffs argue that a private right of action should be implied under the section.

■ In determining whether a private right of action exists under this statute, I must determine "... whether Congress intended to create, either expressly or by implication, a private right of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979). Section 15(c)(1) provides:

No broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange of which it is a member by means of any manipulative, deceptive or other fraudulent device or contrivance....

15 U.S.C. § 78o(c)(1). As plaintiffs concede, section 15(c)(1) does not expressly create a private cause of action. Any private right that exists must therefore be implied from "the language and focus of the statute, its legislative history, and its purpose." *Id.*, at 576, 99 S.Ct. at 2489. I find no evidence in the language and focus of the statute or in the legislative history to suggest that Congress intended to create a private right of action under section 15(c)(1). Because implying a private remedy would not further the regulatory purpose of the statute, I hold that section 15(c)(1) does not authorize a private right of action.

■ The language and focus of the statute neither preclude nor sanction the creation of an implied private right of action. Nothing in the statute indicates that Congress intended to create such a private right. However, the focus of the statute suggests that implying a private right of action would not be inconsistent with Congress' intent. The statute is designed to proscribe fraudulent activities by brokers and dealers, and plaintiffs clearly belong to the class, customers of brokers or dealers, that Congress intended the statute to protect. *See Cort v. Ash*, 422 U.S. 66, 81–83, 95 S.Ct. 2080, 2089–2090, 45 L.Ed.2d 26 (1975). And section 15(c)(1) is more than a reporting provision: it both "prohibit[s] certain conduct [and] create[s] federal rights in favor of certain parties." *Touche Ross*, 442 U.S. at 569, 99 S.Ct. at 2485. So section 15(c)(1) differs in relevant respects from section 17(a)(1) of the Act, which the Supreme Court has held does not authorize private suits. *Id.*

The legislative history evinces no congressional purpose to create a private right of action. The parties have not drawn my attention to any congressional discussion of this issue, and the other courts that have considered this question seem to agree that Congress never explicitly considered whether section 15(c)(1) created a private remedy. *See Corbey v. Grace*, 605 F.Supp. 247, 250–251 (D.Minn.1985); *Pierson v. Dean, Witter, Reynolds, Inc.*, 551 F.Supp. 497, 502 (C.D.Ill.1982).

The final, and in this case decisive, factor in my inquiry is whether implying a private right of action furthers the purpose of the statute. *See Touche Ross*, 442 U.S. at 575–576, 99 S.Ct. at 2488–2489. Section 15(c)(1)'s prohibition of fraudulent activities by brokers and dealers of securities tracks quite closely the section 10(b) prohibition against the use of any manipulative or deceptive device in the sale or purchase of any security. *See* 15 U.S.C. § 78j(b). Both sections are intended to eliminate fraud in the securities market, but section 10(b), which applies to all purchases and sales of securities, is broader than, and subsumes, section 15(c)(1). A private right of action already exists under section 10(b); hence, any activity covered by a private right of action under section 15(c)(1) would already be covered by a private remedy under section 10(b). Implying a private right of action under section 15(c)(1) would do nothing to further the regulatory purpose of the statute. I am unwilling to create a new cause of action where an adequate alternative exists, and I cannot believe Congress intended such a result. Several other courts have come to the same conclusion and found no private right of action under section 15(c)(1). *See Corbey*, 605 F.Supp. at 247; *Berk v. Oppenheimer*, [83–84 Transfer Binder] Fed.Sec.L.Rep. (CCH) 99,-603 (N.D.Ill.1983) [Available on WEST-LAW, DCTU database]; *Chapman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [83–84 Transfer Binder] Fed.Sec.L.Rep. (CCH) 99,419 (D.Md.1983) [Available on WESTLAW, DCTU database]; *Pierson*, 551 F.Supp. at 497: *see also Admiralty Fund v. Hugh Johnson & Co., Inc.*, 677 F.2d 1301, 1313–14 (9th Cir.1982); *Olsen v. Paine Webber, Jackson & Curtis, Inc.*, 623 F.Supp. 17, 18 (M.D.Fla.1985).

 The authority plaintiffs cite to support their contention that section 15(c)(1) implicitly authorizes a private right of action is not persuasive. Most of the cited cases simply assume that a private remedy exists under section 15(c)(1); there is no indication in the opinions that the courts considered the legitimacy of such actions. *See Jordan Building Co. v. Doyle, O'Connor & Co.*, 401 F.2d 47, 50–51 (7th Cir. 1968); *Speck v. Oppenheimer & Co., Inc.*, 583 F.Supp. 325 (W.D.Mo.1984); *Schaefer v. First National Bank of Lincolnwood*, 326 F.Supp. 1186 (N.D.Ill.1970), *app. dismd.*, 465 F.2d 234 (7th Cir.1972); *Livingston v. Weis, Voisin, Cannon, Inc.*, 294 F.Supp. 676 (D.N.J.1968); *Opper v. Hancock Securities Corporation*, 250 F.Supp. 668 (S.D.N.Y.), *affd.*, 367 F.2d 157 (2d Cir. 1966). Plaintiffs cite only one case, *Maher v. J.R. Williston & Beane, Inc.*, 280 F.Supp. 133 (S.D.N.Y.1967), that directly confronts this issue. The *Maher* court argued that the express reference to section 15(c)(1) in section 29(b) of the Act, 15 U.S.C. § 78cc(b), a statute of limitations provision, implied that Congress envisioned a regime allowing a private right of action under section 15(c)(1). *Id.* at 136–139. But section 29(b) creates substantive rights to void a contract that are independent of the rights created by section 15(c)(1). I believe the statute of limitations provision in section 29(b) applies only to actions to void a contract under section 29(b) itself and cannot be read as evidence of a congressional desire to create a private right of action under section 15(c)(1). *See Corbey*, 605 F.Supp. at 250. Furthermore, the *Maher* case was decided before the Supreme Court enunciated the principles that are to guide the creation of implied private rights of action, *see Touche Ross*, 442 U.S. at 560, 99 S.Ct. at 2479; *Cort v. Ash*, 422 U.S. at 66, 95 S.Ct. at 2080, and before the Court made it clear that section 10(b) authorized private actions. In light of these developments in the law and what I believe is a flaw in the

*Maher* court's reasoning, I decline to follow *Maher*.

I conclude that Congress had no intention of creating a private right of action under section 15(c)(1) and that creating such a private right of action would not further the purposes of the statute. I agree with the recent line of cases holding that section 15(c)(1) does not authorize a private right of action. Accordingly, the defendant's motion to dismiss Count II is ALLOWED.

### Motion to Dismiss Remaining Claims

■ Smith Barney moves to dismiss all of the Roberts' remaining claims on the grounds that they fail to state "the circumstances constituting fraud ... with particularity" as required by Fed.R.Civ.P. 9(b). Because fraud lies at the core of all the Roberts' claims, their pleadings must comply with the stringent pleading standard of Rule 9(b). *See Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985). That standard requires that the pleadings be sufficiently particular to give Smith Barney adequate notice of the basis of the claims against it and to provide some grounds for believing that the suit is not simply a strike suit. *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228–229 (1st Cir.1980).

■ The Roberts appear to base their legal claims on four underlying factual allegations. They allege that (1) Smith Barney mislead them through misrepresentations as to or omissions of relevant facts, (2) Smith Barney bought and sold securities without their approval, (3) Smith Barney churned their trading account, and (4) Smith Barney bought and sold securities not suited to their investment objectives. With regard to each of these claims, the experience of the federal courts with securities fraud cases has allowed the development of fairly specific guidelines for determining whether a plaintiff has pleaded with particularity so as to meet the test of Rule 9(b). When alleging misrepresentation or omission of material facts, a complaint must specify "the time, place and contents of [the] alleged false representation." *Id.*,

at 228 (citing cases); *Wayne Investment, Inc. v. Gulf Oil Co.*, 739 F.2d 11, 13 (1st Cir.1984) (citing *McGinty*); *see also Kaufman v. Magid*, 539 F.Supp. 1088, 1096 (D.Mass.1982); *Wittenberg v. Continental Real Estate Partners, Ltd.*, 478 F.Supp. 504, 508 (D.Mass.1979), *affd.*, 625 F.2d 5 (1st Cir.1980). The Complaint alleges the time period during which Diener made the alleged misrepresentations. It alleges the content of those misrepresentations: that Diener and one other Smith Barney employee assured the Roberts of the financial soundness and propriety of Diener's activities. It alleges the securities involved: U.S. Treasury Bonds and U.S. Treasury Bond futures. It indicates that these representations were made primarily by Diener. It states that these misleading representations were made by phone and mail. And it provides trading records of the relevant transactions. These allegations provide Smith Barney adequate notice of the circumstances constituting the fraud and suggests that plaintiffs' action, whether or not ultimately proved meritorious, has some factual basis.

■ With regard to their churning and unsuitability allegations, plaintiffs must allege at least the "nature, amounts and dates of the transactions at issue." The Complaint, as amended, satisfies this standard. The Roberts identify U.S. Treasury Bonds and U.S. Treasury Bond futures as the primary security involved. The Complaint includes trading records detailing the allegedly wrongful transactions. It states the account numbers of the accounts involved and the time period during which the trades allegedly occurred. And the Complaint identifies the Roberts' allegedly express investment objectives. Certainly these allegations notify Smith Barney of the nature and basis of the charges against it. They also suggest a basis for believing that plaintiffs' claims are not merely frivolous.

■ The Roberts' Complaint also contains sufficiently particular allegations as to the charge that Smith Barney bought and sold securities without their approval.

As noted above, the Complaint details the accounts involved and specifies the trades made by Diener. It also specifies the period during which the allegedly wrongful trades were made. The plaintiffs' allegations of trading without approval are therefore pleaded with sufficient particularity to meet the rigorous standard of Rule 9(b).

I find that the Roberts' pleadings satisfy the requirements of Rule 9(b). The Complaint puts Smith Barney on notice of the charges against it and the factual basis of those charges. It is sufficiently particular to allay any fears that plaintiffs are simply fishing for information or engaging in a strike suit. Rule 9(b), which must be read in conjunction with Rule 8 establishing a liberal standard of pleading, does not require the plaintiffs to prove their case at the pleading stage. Plaintiffs have met all requirements for pleading fraud in a securities case and defendant's motion to dismiss Counts I, III, V, VI and VII is DENIED.

### Defendant's Motion to Compel Arbitration

Both the Securities Account Agreement and the Commodity Customers Agreement signed by the Roberts contain arbitration provisions requiring the arbitration of any controversies arising out of the contracts. Smith Barney moves to compel arbitration of any claims that survive its motion to dismiss. Plaintiffs respond by arguing (1) as a matter of law, claims under section 10(b) of the Act are not arbitrable; (2) plaintiffs' claim under the CEA is not arbitrable because the arbitration provision in the Commodity Customers Agreement does not conform to federal law and because claims under the CEA are not arbitrable as a matter of law; and (3) both of the arbitration provisions are unconscionable and hence unenforceable.

### The Section 10(b) Claim

■ Our Court of Appeals has recently decided that section 10(b) claims may be subject to arbitration. *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 806 F.2d 291, 294–297 (1st Cir.1986). Con-

sequently, I find no legal barrier to the arbitration of plaintiffs' section 10(b) claims.

### The Commodity Exchange Act Claim

Plaintiffs' contention that the arbitration provision in the Commodity Customer's Agreement fails to conform to regulations issued by the Commodities Futures Trading Commission has no merit. In fact, Smith Barney's provision incorporates verbatim the very language that the plaintiffs' claim it omits.

■ Plaintiffs also contend that claims under the CEA are not arbitrable as a matter of law. The First Circuit has explicitly rejected this position:

> In our view, however, neither *Wilke* nor its progeny implies that the Commodity Exchange Act should now be read to forbid pre-dispute broker-customer arbitration agreements.... [W]e find nothing in the [CEA] to forbid pre-dispute broker-customer arbitration agreements, so long as they comply with CFTC regulations.

*Ingbar v. Drexel Burnham Lambert,* 683 F.2d 603, 605 (1st Cir.1982). Therefore, I find that plaintiffs may be required to arbitrate their claims under the CEA.

### Unconscionability

■ Plaintiffs also contend that the two arbitration agreements they signed are unconscionable. They ask either for a ruling to that effect or for additional discovery and a hearing to determine whether the provisions are unconscionable. Because plaintiffs have failed to allege any facts that would give rise to a finding of unconscionability, I deny their requests and hold that the arbitration provisions are not unconscionable.

■ Whether a contract is unconscionable is a matter of state law. Plaintiffs direct my attention both to New York and Massachusetts law. I need not choose between the states' laws because each establishes essentially the same test for determining unconscionability. A showing that

a contract clause is unconscionable "requires some showing 'of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *State v. Avco Financial Service of New York, Inc.,* 50 N.Y.2d 383, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075 (Ct. App.1980) (quoting *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965)); *see Zapatha v. Dairy Mart, Inc.,* 381 Mass. 284, 291–295, 408 N.E.2d 1370 (1980). Plaintiffs fail to allege any defect in the formation of the contract that would deny the Roberts meaningful choice. Plaintiffs do not allege "deception of [plaintiffs] as to the clause's content or existence, or the presence of language difficulties or illiteracy affecting its execution, or any other reasons that would have made it unlikely that consent was freely and knowingly given." *Avco,* 429 N.Y.S.2d at 185 (citations omitted). In fact, all indicia suggest that the Roberts consented to the arbitration provisions voluntarily. The provisions were neither hidden in fine print nor obscurely drafted. The Commodity Customers Agreement states in bold type:

ANY CONTROVERSY BETWEEN SBHU AND THE CUSTOMER ARISING OUT OF OR RELATING TO THE ABOVE COMMODITY CUSTOMER'S AGREEMENT, PERMISSION TO CROSS OR AUTHORIZATION TO TRANSFER FUNDS OR THE BREACH THEREOF SHALL, EXCEPT AS PROVIDED BELOW, BE RESOLVED BY ARBITRATION BEFORE A FORUM CHOSEN IN ACCORDANCE WITH THE FOLLOWING PROCEDURE. AT SUCH TIME AS THE CUSTOMER NOTIFIES SBHU THAT THE CUSTOMER INTENDS TO SUBMIT A CONTROVERSY TO ARBITRATION, OR AT SUCH TIME AS SBHU NOTIFIES THE CUSTOMER THAT SBHU INTENDS TO SUBMIT A CONTROVERSY TO ARBITRATION, THE CUSTOMER WILL HAVE THE OPPORTUNITY TO CHOOSE A FORUM FROM A LIST OF TWO OR MORE QUALIFIED FORUMS PROVIDED BY SBHU. A

"QUALIFIED FORUM" IS AN ORGANIZATION WHOSE PROCEDURES FOR CONDUCTING ARBITRATIONS COMPLY WITH THE REQUIREMENTS OF COMMODITY FUTURES TRADING COMMISSION ("CFTC") RULE 180.2.

\* \* \* \* \* \*

THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC) AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.

THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY.

BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR SBHU MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF SBHU

INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.

YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH SBHU. SEE 17 CFR 180.1–180.5.

The Commodity Customers Agreement arbitration provision required separate signatures to be effective.

The Securities Account Agreement bears in bold type the title ARBITRATION OF CONTROVERSIES and is one of only twelve paragraphs of terms and conditions of the contract. These provisions are clear and plaintiffs do not allege either that they were unaware of their existence or that they failed to understand them. The sole procedural defect cited by plaintiffs is that Diener failed to inform them of their legal rights or to tell them to consult an attorney. These allegations alone do not suggest any procedural defect in the formation of the contract. The Roberts were investing over $300,000. If they wanted legal advice, they were certainly capable of seeking it on their own. I find that plaintiffs have failed to allege any facts capable of establishing unconscionable procedural defects in the contracts.

 In addition to some procedural defect giving rise to a suspicion that the Roberts' decision to assent to the arbitration provision was not voluntary, plaintiffs must also allege that the contract term is unfair. They have failed to do so. Plaintiffs apparently assume that requiring them to go to arbitration is in itself unfair. However, there is nothing unconscionable per se in agreements to arbitrate securities or commodities disputes. *See Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 339 (7th Cir.1984); *Surman v. Merrill Lynch, Pierce, Fenner & Smith,* 733 F.2d 59, 61 n. 2 (8th Cir.1984); *Smoky Greenhaw Cotton Co., Inc. v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 720 F.2d 1446, 1450–1451 (5th Cir.1983); *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1030 n. 49 (6th Cir.1979). In fact, there is a strong federal policy favoring arbitration of such disputes. *See Dean, Witter, Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Arbitration is a useful and efficient method for resolving disputes, *see id.,* and arbitration provisions are a reasonable response to a commercial need. Therefore, there is nothing per se unfair or unreasonable about including a pre-dispute arbitration requirement in a broker-customer contract. Since plaintiffs do not draw my attention to anything particular about this contract that would make it unfair, I find that they have failed to allege any facts to suggest that the contract is unconscionable.

Plaintiffs' argument boils down to the contention that because Smith Barney is "bigger" than plaintiffs, and because the arbitration provision has proven inconvenient, I should abrogate it. But the principle of unconscionability "is one of prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power." *Zapatha,* 381 Mass. at 292, 408 N.E.2d 1370. Plaintiffs present no evidence that they have been unfairly surprised or oppressed by this clause; hence, I find that the arbitration provisions are not unconscionable. I find no grounds in the material before me to believe that additional discovery and hearing will be of any use. I therefore deny plaintiffs' request for further discovery and a hearing.

The arbitration agreements signed by plaintiffs are enforceable. Accordingly, defendant's motion to compel arbitration is ALLOWED.

### Conclusion

Defendant's motion to dismiss Counts II and IV of the Complaint is ALLOWED.

Defendant's motion to dismiss Counts I, III, V, VI and VII is DENIED.

Defendant's motion to compel arbitration of Counts I, III, V, VI and VII is ALLOWED.