Christopher C. **TRUNDY, individually**
**and in behalf of National Equity**
**Corporation, Plaintiffs,**

v.

Richard **STRUMSKY, Joanne Strumsky,**
**Edward McCormick, Debra McCor-**
**mick, Wayne C. Krupsky, and Sidney J.**
**Dockser, Defendants.**

**Civ. A. No. 87–2221–Y.**

United States District Court,
D. Massachusetts.

Jan. 19, 1990.

Christopher C. Trundy, New Bedford, Mass., pro se.

Paul McDonald, Eileen Morrison, Grannan, McDonald Maloy & Steinkrauss, Arlington, Mass., Gary Ritter, Lawrence, Mass., Sidney Dockser, Needham Hts, Mass., for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

On September 8, 1987, Christopher C. Trundy ("Trundy"), acting pro se on his own behalf and, pursuant to Fed.R.Civ.P. 23.1, as a shareholder derivative action on behalf of National Equity Corporation ("National"), commenced this action against Richard Strumsky, Joanne Strumsky (together "the Strumskys"), Edward McCormick, Debra McCormick (together "the McCormicks"), Wayne Krupsky ("Krupsky"), and Sidney Dockser ("Dockser"). The complaint alleges as Counts I through V against various of the defendants: a civil violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. sec. 1964 (1982) ("RICO");

breach of contract, breach of loyalty, conflict of interest, fraudulent delay in refusing legal demand for return of corporate records, conversion, and intentional infliction of emotional harm. In particular, all counts are alleged against the defendant Krupsky, and the alleged RICO violation is alleged by Trundy individually against all the defendants. Trundy invokes federal subject matter jurisdiction under 18 U.S.C. sec. 1964(c) (1982).

The matter is presently before the Court on Krupsky's motion for summary judgment on all counts. At a hearing on February 3, 1989, this Court ordered Krupsky to produce documents requested by Trundy by March 3, and both parties were given until April 3 to file further affidavits and memos.

## I. FACTUAL BACKGROUND

For the purposes of a motion for summary judgment, the Court must examine the record and view the facts in the light most favorable to the non-moving party. *Raskiewicz v. Town of New Boston*, 754 F.2d 38 (1st Cir.1985). Having done so, the Court may grant summary judgment only if the moving party has shown that there is no genuine issue of material fact and that he is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c). Accordingly, the recitation which follows sets out events entirely from Trundy's point of view.

### A. *General.*

On November 1, 1981, the Strumskys, McCormicks, and Trundy formed National, a debt collection agency, as a Massachusetts corporation. Trundy left his employment at Merrill Lynch in order to assume the presidency of the new company. The Strumskys and McCormicks received 49% of the National shares, while Trundy received 51% in consideration of his business contacts, deferral of salary for several

years, and giving an unsecured note to Richard Strumsky for five thousand dollars. Richard Strumsky was to provide twenty thousand dollars start-up capital plus any additional amounts as needed. As president, Trundy's primary responsibility was to solicit new business. Joanne Strumsky was to serve as secretary and clerk, and was also responsible for monitoring the client escrow account. Edward McCormick was to serve as treasurer and bookkeeper. Trundy and Joanne Strumsky were the only two with checkwriting authority.

At some time in 1983, responsibilities for bookkeeping and monitoring the client escrow account were "dumped" on Trundy. Apparently the promised funding from Richard Strumsky had not been entirely forthcoming, and when Trundy asked Joanne Strumsky how he was going to pay the company bills, she responded by handing over the escrow account books to him, saying, "Get it from here." It seems that this was the beginning of a continued use of escrow funds to pay company debts. Trundy paid himself $18,840 between November 4, 1982 and January 25, 1984, as reimbursement for travel and entertainment expenses.

In April, 1983, Krupsky, a certified public accountant and friend of the Strumskys, was hired by Trundy on a consultant basis to reconcile the balance of the corporate checking account, determine liability for funds unremitted to clients from the corporate escrow account, prepare various unaudited financial statements, prepare quarterly tax returns, and render accounting advice. He was not, however, hired to keep the daily books.

In January, 1984, the Strumskys asked Krupsky to prepare an accounting of the client escrow account as of December 31, 1983. Krupsky calculated liability to clients of $43,186.04, but a cash balance in the escrow account of only $8,676.87. On January 27, 1984, the Strumskys and McCormicks met to discuss the shortfall without Trundy's knowledge. The Strumskys and McCormicks apparently believed the problem stemmed from Trundy's political activities. On January 28, 1984, Trundy discovered numerous corporate documents and records were missing from the office, which he claims were taken by Joanne Strumsky (Trundy's averments are somewhat contradictory on this point). He called the Strumsky residence, then drove there and found the Strumskys, Edward McCormick, and Krupsky. Trundy was confronted with the news of the shortfall. Trundy maintained that he knew there was probably some shortfall, but that the amount was small and not anything close to the $34,509.17 calculated by Krupsky. He asked to look at the calculations and records himself but the others refused. He asked that certain fees and other items be taken into account and that an independent audit be done, but these suggestions were likewise refused. Instead, the Strumskys and Edward McCormick, with Krupsky remaining silent, threatened to report Trundy to the Massachusetts Banking Commissioner with criminal prosecution to follow.

On January 30, Trundy called Krupsky by phone and fired him. Krupsky responded that he considered that he was accountable to Richard Strumsky. He refused to turn over any National records to Trundy on the grounds that an accountant has the professional responsibility to return documents only to the corporate officer or director who gave them to him—this despite the fact that, on January 26, 1984, Trundy had personally delivered to Krupsky's home in Georgetown, Massachusetts, various payroll and financial records of National so that Krupsky could work up tax statements.

The "Krupsky Report," detailing Krupsky's findings regarding the escrow ac-

count, was issued February 4, 1984, and addressed to "Board of Directors, National Equity Corporation," at the Strumsky's home address, not the corporate address. The report noted that "... it appears that the transactions initiated in the [escrow] account were controlled by Mr. Christopher Trundy," and stated that Krupsky had "... not ... discussed the results ... with Mr. Trundy. Therefore I am not aware of any adjustments that may be necessary to such accounts other than those included in the documents provided. Such documents were lacking in explanatory notation which, if available, may alter the results." The report gave as its understanding that the escrow shortfall was in violation of state regulations, and recommended that the shortfall be discussed with Trundy and the application of the missing funds investigated.

### B. *Extortion.*

On Sunday, January 29, the day after the confrontation with Trundy, the Strumskys, McCormicks, Trundy, and Robert Bippus ("Bippus"), the vice-president of National as well as a potential investor, discussed how to raise new capital. It was agreed business would proceed as usual the next day. On the evening of Tuesday, January 31, McCormick told Trundy by phone that Richard Strumsky had been in touch with the brother of the Massachusetts Banking Commissioner. Trundy alleges that this brother was then current counsel to the Strumskys. McCormick told Trundy that if he (Trundy) would sign over his interest in National to Richard Strumsky without compensation, and get out of the collection business, the Massachusetts Banking Commission would not prosecute him. This threat was repeated on February 1, 1989, by Richard Strumsky.

Trundy apparently stopped participating in the conduct of National's business after January 31, 1984. Trundy attended a meeting at which Bippus presented a plan of action for the company, but he "said not one word." He never signed over his share of the company nor did he relinquish any claim to it. The defendants do not appear to dispute this. United States Corporate Income Tax Form 1120 and Massachusetts Department of Revenue Corporate Excise Return, both prepared by Krupsky for National, listed Trundy as the owner of more than 50% of the voting stock of the company as of October 31, 1984. The latter also listed him as president.

Sometime in February, 1984, Trundy avers that Edward McCormick and Richard Strumsky gave him a letter they wrote to the brother of the Banking Commissioner, saying that all attempts to remove Trundy without compensation had failed. On April 26, counsel for the Strumskys—one Sidney Dockser—offered to buy National from Trundy for five thousand dollars ($5,000.00). Joanne Strumsky, who was present, burst out that if Trundy did not accept, she knew where she was going and to whom she was going to talk. Richard Strumsky calmed her down. From May to the end of July, 1984, Dockser offered either to buy Trundy's interest in National from him, or to sell the interests of the other shareholders to him, for twenty-five thousand dollars ($25,000.00). Trundy agreed to sell on condition that he be allowed to review the books. He was shown some records but apparently not enough to satisfy him.

On September 7, Richard Strumsky confronted Trundy in person and said "we've arranged to have this whole thing blow up on you by election day [September 18th]." Nothing happened. On September 19th, Dockser wrote "I thought you would like to know that my people have applied for a Criminal Complaint against [you] through the office of the Norfolk District Attorney." Nothing happened.

Trundy alleges the incidents of January 31, February 1, April 26, September 7, and September 19 are extortionate threats of criminal prosecution in violation of Mass. Gen.Laws Ann. ch. 265, sec. 25 (West 1970). As such violations carry a maximum term

of over one year in prison, they constitute predicate acts under RICO 18 U.S.C. sec. 1961(1)(A) (1982).

C. *Mail Fraud.*

The last meeting of National's Board of Directors which Trundy attended was held January 17, 1984. At that meeting, Trundy stated that National had unpaid "tax liabilities of $4,800 which should be paid within 60 days." By early 1985, National was completely non-operational. Several loose ends and remaining liabilities required attention. With a letter dated September 18, 1985, Krupsky mailed completed U.S. Corporate Income Tax Forms 1120 for National for 1983 and 1984 to Joanne Strumsky for her approval, since those returns had never been filed. He also sent to her an assessment of withholding taxes owned by National to the United States for the quarters ending September 30, 1983 and December 31, 1983, in the amount of $8,518.23. He was never paid for this work.

On February 20, 1985, Trundy received notice from the Internal Revenue Service that he was being held personally responsible for National's unpaid withholding taxes from the 3rd and 4th calendar quarters of 1983. On November 7, 1985, the Internal Revenue Service notified Joanne Strumsky of their intent to assess a penalty in the amount of $5,392.14 against her for failure to pay withholding taxes she was required to collect for National. She mailed a protest, prepared by Krupsky, stating that during the period in question she had no responsibilities for paying bills or taxes, or filing of tax returns for National, and that her protest was based upon the definition of a responsible person under Internal Revenue Code Section 6672. She further stated that after she did become a responsible person, in February, 1984, that she had no specific knowledge of any tax delinquencies until her accountant had advised her of their existence the previous month.

On September 30, 1986, the Internal Revenue Service assessed some combination of taxes, interest or penalties against Trundy for unpaid withholding taxes of National from December 31, 1983. On February 13, 1987, the Internal Revenue Service placed a lien on Trundy's assets for failure to pay a balance of $5,484.65.

Krupsky also prepared and mailed to Joanne Strumsky a Massachusetts Department of Revenue Corporate Excise Return for the year ending October 31, 1984, which listed Trundy as caretaker of the corporate books. National then owed the minimum excise tax of $228.

Trundy alleges that the statement that the corporate books were in his care was false, and the statement that Joanne Strumsky had no specific knowledge of tax delinquencies arising from a period prior to her assuming control of National was likewise false. Trundy then alleges Krupsky's mailing of the prepared Massachusetts return and of the prepared protest of Internal Revenue Service assessment to Joanne Strumsky, constitute mail fraud, a violation of 18 U.S.C. sec. 1341, and RICO predicate acts.

D. *Conversion.*

The alleged conversion appears to be grounded on events taking place in early 1985. National's operating bank account had been changed a year earlier, and its corporate address changed in late 1984. North American Equity Corporation ("North American"), wholly owned by the Strumskys, had been established by early 1985. Krupsky served as accountant for both National and North American, as well as for the Strumskys and McCormicks. His last invoice for services which National paid was dated February 7, 1985, the same day as his first invoice for services which North American paid. Evidence shows the identical collection agency code number on the American Collectors Association data sheets for both National and North American, and the opening receivables balance for National on Monday, January 28, 1985 and for North American on Thursday, January 31, 1985, were identical at $1,706.12 for Type 1 clients and $12,504.23 for Type 2 clients. A schedule of quarterly payroll taxes for National prepared by Krupsky indicated that for the last quarter then

reportable, ending December 31, 1984, "these [taxes] may have been paid by North American Equity." Upon these alleged facts, Trundy claims that his interest in National was wrongfully converted to the use of certain of the defendants.

## II. THE MOTION FOR SUMMARY JUDGMENT

### A. COUNT I—The Alleged RICO Conspiracy.

#### 1. Burden of Production and Issues before the Court.

■ Trundy argues that since his claim against Krupsky is that Krupsky conspired under 18 U.S.C. sec. 1962(d) to violate 18 U.S.C. sec. 1962(c), the issue before the Court is whether Krupsky conspired with the other defendants, *vel non*, with the existence of the intent to violate section 1962(c) assumed to be true for the purposes of this motion.

This is exactly backwards. Under Trundy's argument, a plaintiff could breathe life into any common conspiracy sufficient to bypass summary judgment and bring every complex RICO allegation to trial. If the Court had to assume that a substantive RICO violation was the goal of the conspiracy and focus only on the existence of a conspiracy among the defendants, only a rare motion for summary judgment on a RICO conspiracy charge would succeed no matter how unsupportive the underlying facts. This is not the law. Under *United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981), proof of a racketeering conspiracy requires, *inter alia*, proof that each conspirator specifically intended to engage in the alleged pattern of racketeering activity. Here, therefore, Trundy must produce evidence sufficient for the fact finder to conclude that Krupsky and the others each specifically intended to engage in a pattern of racketeering activity. *See* 18 U.S.C. sec. 1962(a)(b) and (c). *See also Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1936). Trundy's focus on the fact of conspiracy *vel non* cannot absolve him of the burden of proving an intent to engage in a pattern of racketeering activity and it is to that issue the Court must turn.

#### 2. The RICO "Pattern" Requirement.

##### a. *Northwestern Bell* Analysis

■ The Supreme Court, in *H.J. Inc., et al., etc. v. Northwestern Bell Telephone Company et al.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), recently reaffirmed and expanded upon the meaning of the term "pattern" which it gave in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). A pattern of racketeering activity "requires at least two acts of racketeering activity," 18 U.S.C. sec. 1961(5), but "... proof of two acts of racketeering activity, without more, does not establish a pattern." 109 S.Ct. 2893 at 2900 (quoting Senator McClellan, 116 Cong.Rec. 18940 [1970]). "To establish a RICO pattern it must ... be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." 109 S.Ct. 2893 at 2901. " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to a past conduct that by its nature projects into the future with the threat of repetition." 109 S.Ct. 2893 at 2902. "A RICO pattern may surely be established if the related predicate acts themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit.... In other cases, the threat of continuity may be established by showing that the predicate acts or offense are part of an ongoing entity's regular way of doing business." 109 S.Ct. 2893 at 2902.

Even giving Trundy's affidavits every favorable inference within reason, this is not a case of "open-ended" continuity. The threats of the defendants were not of the type which implied ever continuing racketeering, such as monthly extortionate "insurance" payments. Here, the conversion of the value of Trundy's interest in National is completed, and no evidence is offered that extortion, or any racketeering activities, are part of the defendants' regular way of doing business. It appears that the defendants' behavior here was "closed-ended," and lacked the requisite continuity to

establish a pattern. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." 109 S.Ct. 2893 at 2902. Trundy alleges nine months of repeated threats of criminal prosecution beginning late January, 1984, followed by two acts of mail fraud, in or about September and December, 1985. This certainly covers more than a few months. Nevertheless, it is not dispositive. Courts following *Sedima* have held activities spanning 22 months, *Roberts v. Smith Barney, Harris Upham & Co., Inc.* 653 F.Supp. 406 (D.Mass.1986), and even seven years, *Fleet Credit Corp. v. Sion*, 699 F.Supp. 368 (D.R.I.1988), to lack the requisite continuity.

Indeed, the nine month period of extortion is particularly misleading. The threats of September 7 and 19 are immaterial, since neither threat constituted extortion, that is, the extraction of an act or forebearance to act on the part of the victim in exchange for a forebearance to injure the victim in some other way to which the perpetrator is not legally entitled. *Commonwealth v. Miller*, 385 Mass. 521, 432 N.E.2d 463 (1982). In September, 1984, there was no attempt to extract anything from Trundy. The September communications were threats of revenge, not RICO predicates. The April 26 outburst by Joanne Strumsky can certainly be interpreted as similar to the January 31 and February 1 extortionate threats. It is, however, somewhat mitigated by the reaction of Richard Strumsky, and particularly by the February letter to the brother of the Banking Commissioner, which indicated the Strumskys and McCormicks had given up on their plan to force Trundy out via extortion. Two identical extortion attempts on two successive days, followed by written evidence that the extortionists had given up, even if followed two months later by Joanne Strumsky's outburst, is weak evidence indeed of a threat of continuing racketeering activity.

Even if the Court were to consider all five instances as extortion, the evidence of a RICO pattern is weak. Rather than a series of similar threats to obtain repeated payoffs as was the case in *Northwestern Bell*, here the repeated threats had only one object, or "payoff," in mind—to obtain Trundy's interest in National without paying fair compensation. Indeed, the repeated threats were never carried out. They appear to have had but one consequence—Trundy simply abandoned work at National. The threats extended over time only because Trundy would not yield and because the threat was empty, a fact which must have become obvious before October, 1984, when the defendants tired of crying "Wolf!" and moved on to acquire National through the expedient of their intra-corporate machinations. The Court concludes that regardless how many legally distinct "acts" of attempted extortion occurred, under the circumstances they were effectively a single attempt at extortion, insufficient by themselves to fulfill the continuity requirement of a RICO pattern.

The alleged mail fraud does not add much. Courts are particularly reluctant to rely over much on mail fraud predicates to establish a RICO pattern. "In today's integrated interstate economy, it is the rare transaction that does not somehow rely on extensive use of the mails or the telephone." *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 31 (1st Cir.1987) (quoting *Eastern Corporate Fed. Credit Union v. Peat, Marwick, Mitchell & Co.*, 639 F.Supp. 1532, 1535 [D.Mass.1986] ). Here, the use of the mails was incidental to the actual fraud (tax returns are required, and are generally mailed), rather than an inherent abuse of the mail as a distribution channel (such as a mass mailing to fraudulently induce recipients to part with their money). While both are legally mail fraud, the latter example supports that element of relatedness and continuity which paints a picture of a RICO pattern. The instant case is merely fraud which happened to use the mails. Also, the mail fraud in question took place one year after the last instance

of an extortionate threat. The allegations of mail fraud in this case contribute only weakly to the pattern element and do not change the outcome.

### b. "Multi Factor" Analysis

The First Circuit endorsed a case by case, multiple factor examination of the facts to determine if the plaintiff could survive motions for dismissal or summary judgment in the RICO context. *Roeder v. Alpha Industries, Inc.*, 814 F.2d at 31. This approach is consistent with footnote 14 of *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285 (*see* D. Smith and T. Reed, Civil RICO, para. 4.02–4.04 [1989]) and *Northwestern Bell*, 109 S.Ct. 2893. The Seventh Circuit was the first court of appeals to follow this approach. *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986). The trend in District Courts of the First Circuit is to use an expanded version of the *Morgan* factors. *Roberts v. Smith Barney, Harris Upham & Co., Inc.*, 653 F.Supp. 406 (D.Mass.1986); *Winer v. Patterson*, 663 F.Supp. 723 (D.N.H.1987); *Norman v. Brown, Todd & Heyburn*, 693 F.Supp. 1259 (D.Mass.1988); *Fleet Credit Corp. v. Sion*, 699 F.Supp. 368 (D.R.I.1988).

The factors to examine are (1) the number of independant victims of the alleged activity, (2) the number of participants in the alleged crimes, (3) the purpose of the activity, (4) the result of the activity, (5) the method of commission, (6) the number of transactions, (7) whether the scheme is ongoing and open ended, and (8) the duration of the activity. *Roberts*, 653 F.Supp. at 412. A consideration of these factors confirms the analysis and result reached pursuant to *Northwestern Bell*.

Trundy claims that there are three victims of the RICO activity: National, the Internal Revenue Service, and himself. Upon the record in this case, however, only Trundy himself has been genuinely victimized. The Internal Revenue Service is at most an incidental and minor victim of the alleged mail fraud. Joanne Strumsky did not deny that the taxes were owed by someone and the Internal Revenue Service assessed her, and Trundy as well, for the back taxes and penalties. The Internal Revenue Service is in little danger of not collecting its due. The only injury to the Internal Revenue Service of the alleged mail fraud is the cost of evaluating the claim of Joanne Strumsky that she is not responsible for the tax delinquency. The real victim is Trundy. The Court declines to develop a Calculus of Victim Quantization, perhaps assigning a weight of 1.0 to Trundy, 0.1 to the IRS, 0.0000001 to each taxpayer, and so on. Suffice it to say that there is here one primary victim and one unintended, incidental, minor victim—hardly the scenario one would expect from a pattern of racketeering activity.

The *Roberts* decision added the number of participating defendants to the factors noted in *Morgan*. Here there were six, a factor somewhat supportive of a RICO allegation. The purpose of the activity was, however, merely singular: to take Trundy's interest in National. Trundy's interest included his prospective ability to pay the delinquent taxes for which he was personally responsible. That there is now a lien in favor of the United States on his property is simply testimony to the success of the defendants in converting Trundy's portion of National, not evidence of a new injury or purpose of the activity. The alleged extortion attempt appears to have failed in its major objective, resulting only in Trundy abandoning National. It did, perhaps, ultimately allow the defendants to convert his interest in National without his immediate interference. Still, the result of the alleged plot is essentially singular—Trundy has lost his interest in National and is left holding the bag—*i.e.*, an outstanding tax liability. The remaining factors all indicate the unitary nature of the alleged scheme. The perpetrators allegedly carried out their activities by a small series of extortionate threats directed, over a nine month period of time, towards a single goal which has now been accomplaihed by means other than extortion (*i.e.*, conversion).

### c. Conclusion

Both analyses lead to the same conclusion. Trundy's allegations—even taken at face value and indulging all reasonable inferences in his favor—simply do not make

out the requisite pattern of racketeering activity. Trundy's allegations of RICO violations, accordingly, must be, and hereby are, dismissed. Summary judgment on such allegations shall enter for the defendants.

### B. What now?

■ With the collapse of his RICO hopes, the entire edifice of Trundy's complaint crumbles. Since his other claims are pendent state causes of action, the demise of the RICO claim—that claim upon which he has staked federal jurisdiction—causes the remainder of his complaint to be dismissed without reaching the merits since trial is still some months in the offing. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court would take such action at once were it not for two factors.

First, a RICO counterclaim naming Trundy as defendant is found among the papers in the case. This is an independent source of federal court jurisdiction. While it may be open to attack on the same grounds as are articulated above, Trundy has not mounted such an assault. Moreover, while the defendants, having defeated Trundy's RICO allegations, would probably now just as soon drop the RICO counterclaim without prejudice so that this entire federal case will be dismissed, Trundy's answer to the counterclaim precludes that result absent his consent. Fed.R.Civ.P. 41. Having reviewed the counterclaim sua sponte, it appears to be little more than a backfire, interposed chiefly to counterbalance Trundy's own RICO allegations. If the Court is correct in its analysis, the defendants will not object to a dismissal of the counterclaim with prejudice as part and parcel of an overall dismissal of the case from this Court.

Second, this Court considers it improvident to dismiss the pendent state claims if Trundy or any of the defendants are thereby deprived of a forum altogether due to the running of some applicable Massachusetts statute of limitation. While this Court reads the phrase "matters of form" appearing in Mass.Gen.Laws. ch. 260, sec.

32 as applying to this situation—i.e., the dismissal of pendent state claims by a federal court not on the merits, but for lack of subject matter jurisdiction, this Court is hardly the final authority on that matter of state law and a review of the state authorities casts some doubt on the Court's reading. Granahan v. Commonwealth, 19 Mass.App.Ct. 617, 620 n. 6, 476 N.E.2d 266 (1985), and cases cited therein. Accordingly, any dismissal will be accompanied by the proviso that, should the dismissal result in the refusal of a Massachusetts court to entertain any of these pendent claims on the ground of the running of a Massachusetts statute of limitation, such dismissal will be automatically vacated and the Court will thereupon attempt to transfer the case to the Massachusetts state courts pursuant to the innovative procedure developed by Judge Keeton in Pallazola v. Rucker, 621 F.Supp. 764, 770–71 (D.Mass.1985), aff'd, 797 F.2d 1116 (1st Cir.1986). That failing, in the interests of justice the Court will entertain the pendent state claims itself since federal jurisdiction was properly invoked at the time of the filing of the complaint.

### III. CONCLUSION

For the reasons set forth above, Krupsky's motion for summary judgment, at least as to Count I of Trundy's complaint, is ALLOWED and, as the defect is applicable to all the defendants, summary judgment shall enter for each of them on Trundy's RICO allegations. Thirty days from the date of this order, unless one or more of the defendants file a written objection thereto, the RICO counterclaim is dismissed with prejudice on the merits. With the RICO allegations conclusively out of the case, subject matter jurisdiction disappears and each and every remaining claim and counterclaim is dismissed without prejudice—not on the merits but due to the lack of subject matter jurisdiction—to the proviso set forth in Section II B above.

It is SO ORDERED.