**Nicholas T. FILLORAMO, Plaintiff,**

v.

**JOHNSTON, LEMON & CO., INC., and Robert H. Boorman, Jr., Defendants.**

**Civ. A. No. 87–1473 (RCL).**

United States District Court,
District of Columbia.

July 28, 1988.

---

Steven J. Toll (argued), Andrew N. Friedman (with him on the brief), Cohen, Millstein & Hausfeld, Washington, D.C., for plaintiff.

Douglas K. Spaulding (argued), John A. Beck, Daniel K. Steen, Lawrence G. Brett (with him on the brief), Reed, Smith, Shaw & McClay, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Plaintiff Nicholas T. Filloramo brings this action against defendants Johnston, Lemon & Co. Inc., a stock brokerage firm, and Robert H. Boorman, Jr., a Johnston Lemon employee who acted as Filloramo's stockbroker from August, 1982 until sometime in early 1986. Filloramo claims violations of section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, and brings common law counts of fraud and deceit, negligent misrepresentation, and breach of fiduciary duty. He also claims violations under "RICO", the Racketeer Influenced And Corrupt Organizations Act. Defendants have moved for summary judgment.

FACTS

This action centers around a sequence of transactions from December 1982 until late in 1985, involving three stocks in plaintiff Filloramo's portfolio: Manor Care, Johnson Electronics and Megadata. In essence, Filloramo alleges that defendant Boorman first fraudulently induced him to sell his substantial holdings—over $200,000—in Manor Care, and then fraudulently induced him to invest the proceeds in Johnson Electronics and Megadata. The scheme was motivated, under Filloramo's theory, by Johnston Lemon's twin desire to recoup $10,000 it gave Filloramo in settlement of an earlier, unrelated dispute, and also to push Johnson Electronics and Megadata stocks on its customers in the hope it would influence the two companies to hire Johnston Lemon as their investment banker.

When Filloramo eventually sold his holdings in Johnson Electronics and Megadata, he suffered losses of over $60,000; in the meantime, Manor Care had more than doubled in value to over $600,000.

In the motion papers and discovery filed with the Court, the factual disputes are well defined (although somewhat hazily remembered by the principals). Filloramo contends that in late 1982, Boorman called to advise him that he should liquidate his substantial holdings in Manor Care, a company engaged in nursing care and related businesses. Boorman gave as a reason that the government had announced it would no longer reimburse nursing homes under its Medicaid program. Filloramo Deposition at 186–187. However, Manor Care had never significantly relied on Medicaid patients, and there was no reason to believe it would be adversely affected by a government cutback of such payments. Further, Boorman was aware of this, or should have been, since this information was contained in Johnston Lemon reports in existence at the time.

Defendants for their part contend that Filloramo was also in possession and aware of the same information, since the same reports were sent to him on a regular basis. Further, although Boorman does not recall whether he advised Filloramo to sell his Manor Care holdings, Boorman Deposition at 54, he explicitly denies advising him

to do so because of cutbacks in Medicaid reimbursements. *Id.* at 58.

Filloramo next alleges that sometime in 1983, he is not sure when but possibly in March, *see* Filloramo Deposition at 125, Boorman began to extol the prospects for Johnson Electronics. The tenor of his comments was that the company had a "pending" contract which would transform it into a $100 million company, and that this was "imminent." As a result, Filloramo made an initial purchase of the stock in March, 1983. The contract never materialized.

Nevertheless, Filloramo continued to purchase Johnson Electronics, making purchases in September, 1983, and again some two years later in August, 1985. Joint Pretrial Statement, Stipulated Facts at 2. Before each purchase, Boorman allegedly repeated the same story about the pending $100 million contract, telling Filloramo he was now in contact with the president of the company, that it would be signed within two or three months, and explaining away the obvious fact it had not yet been signed as earlier promised because of a design change or other delay. Filloramo Deposition at 130–137. Filloramo invested a total of about $80,000 in Johnson Electronics, and claims losses of about $22,000 when he liquidated his holdings in the stock in 1986.

At his deposition, Boorman acknowledged recommending the stock to Filloramo, Boorman Deposition at 30, but he did not recall whether he made the representations alleged by Filloramo. *Id.* at 38. Defendants have produced no evidence that, if Boorman did make such representations, he had any basis for doing so.

The parties' respective stories about Megadata continue in this vein. Filloramo alleges that Boorman told him of illusory large contracts Megadata was about to obtain with companies throughout the airline industry, based on a super smart computer the company was developing for use in reservations programs. Boorman allegedly led Filloramo to believe that such contracts were a certainty. Filloramo Deposition at 173. Based on this, Filloramo began purchasing Megadata in January, 1983. And as with Johnson Electronics, he continued

to purchase the stock, buying in June and October, 1983, in February, June, and July, 1984, and in February, 1985, Joint Pretrial Statement, Stipulated Facts at 2–3, always pursuant to the same representations by Boorman about contracts with airline companies in the very near future. Filloramo Deposition at 166–173. And as with Johnson Electronics, before each purchase of Megadata, Filloramo adamantly trusted Boorman's representations that although the upcoming contracts had been delayed temporarily, they were now about to happen. Over the two year period, Filloramo alleges he invested approximately $100,000 in Megadata, and when he sold out in 1986 he took a loss of about $41,000.

Boorman on the other hand, while agreeing he did recommend that Filloramo purchase Megadata, Boorman Deposition at 42–43, denies he represented that contracts throughout the airline industry were a certainty, or even that there was a good chance they would occur. *Id.* at 143.

Basic to Filloramo's version of events is that he reposed great and undaunted trust in Boorman, and continued to rely on the information he received from Boorman because of the pressures of running his own business. *See e.g.,* Filloramo Deposition at 136–137.

DISCUSSION

1. Common Law And Securities Law Claims

Defendants' motion for summary judgment on the securities fraud and common law fraud claims has little force. They argue in essence that Filloramo can not establish scienter, an essential element of a section 10(b) and Rule 10b–5 claim, where the underlying fraud is based on misrepresentations of future events. Further, defendants argue in any case that there has been no showing that Boorman knew his representations were false, or that he had the requisite intent to deceive Filloramo. Finally, they claim Filloramo could not reasonably have relied on such misrepresentations, since he was a sophisticated investor and had access to the same information available to Boorman.

## The Securities Law Claim

■ It is well established that an action may be brought under section 10(b), 15 U.S.C. § 78j(b) (1982), and Rule 10b–5, 17 C.F.R. § 240 10b–5 (1987) against a stockbroker who states an opinion without a genuine belief in its accuracy, or with a reckless disregard for its truth or falsity. *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 390 (1985). This principal applies to forecasts and predictions. *Abrams v. Oppenheimer Government Securities, Inc.* 589 F.Supp. 4, 9 (N.D.Ill. 1983), *aff'd* 737 F.2d 582 (7th Cir.1984).

■ In addition, the element of scienter under section 10(b) and Rule 10b–5 embraces reckless conduct, as well as conduct that is knowing or intentional. *Dirks v. Securities and Exchange Commission*, 681 F.2d 824, 844–845 (D.C.Cir.1982), *rev'd on other grounds*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). Further, a plaintiff need not produce direct evidence of a defendant's state of mind; circumstantial evidence will suffice if it supports an inference of intentional, knowing, or reckless behavior. *Wechsler v. Steinberg*, 733 F.2d 1054, 1058–1059 (2d Cir.1984) (the court noting that issues of intent and motive are usually inappropriate for disposition on summary judgment).

■ Thus, Filloramo can bring a securities fraud claim against defendants based not only on Boorman's alleged misrepresentation of a present fact; that Manor Care depended on government Medicaid payments. He may also bring such a claim on the alleged misrepresentations by Boorman regarding future events; that a $100 million contract for Johnson Electronics was pending or imminent, and that airline industry-wide contracts for Megadata were also imminent. Further, if a jury believes Filloramo's testimony that Boorman made such representations (one of which, concerning the $100 million contract for Johnson Electronics, he does not deny making), the absence of reports or other evidence that would give him a basis for making such predictions could lead it to conclude he acted recklessly.

■ Also, if Filloramo establishes at trial that defendants sought to recoup the $10,000 settlement Johnston Lemon awarded him prior to the disputed transactions, and if he establishes that defendants actively pushed Johnson Electronics and Megadata stocks on customers such as Filloramo in the hope that Johnston, Lemon would become the investment banker for those two companies, a jury could reasonably consider such factors as evidence that Boorman's misrepresentations were intentional.

Filloramo has cited significant evidence material to Boorman's state of mind: it is undisputed that Filloramo *did* receive a $10,000 settlement from Johnston Lemon prior to the transactions in dispute here. In addition, defendants acknowledge that Johnston Lemon's reports at the time showed that Manor Care would not be adversely affected by government cutbacks in Medicaid spending, Defendant's Motion for Summary Judgment, Statement of Material Facts at 5, contrary to the alleged misrepresentations by Boorman. Also, if the jury believes Boorman made false representations concerning large lucrative contracts for Johnson Electronics and Megadata, then the Johnston Lemon reports on those companies may be relevant to show that such predictions had no basis in fact. *See e.g.* Boorman Deposition, exhibits 8, 9, 11, 13. Further, Filloramo has discovered evidence that Johnston Lemon had expressed a desire to Megadata to manage an offering by that company, pointing out that one of Johnston Lemon's employees "has gotten several other brokers here to buy Megadata in size, so that a significant percentage of your stock now resides with our customers." *Id.*, exhibit 19. This is sufficient for Filloramo to survive summary judgment on the issues surrounding Boorman's state of mind.

## The Common Law Fraud Claim

■ The situation is entirely similar regarding Filloramo's common law fraud claim, which also may be based on misrepresentation of a future occurrence, contrary to the general rule, if "circumstances

indicate that the parties did not stand in a position of parity and normal wariness with respect to the subject of the representation,...." *Day v. Avery*, 548 F.2d 1018, 1026 (D.C.Cir.1976), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977). Such a circumstance was found to exist in *Day* where a member of a law firm's executive committee assured a new partner, incorrectly as it turned out, that "no.... partner would be worse off as a result of the merger." *Id.* at 1025.

The *Day* court reasoned that there are three exceptions to the general rule that a prediction can not form the basis for a misrepresentation claim. First, where the speaker and listener have a fiduciary relationship, the court reasoning that a beneficiary can justifiably expect a fiduciary to investigate facts underlying an opinion which he knew his beneficiary might depend on; secondly, where the speaker may reasonably be understood as having based a prediction on facts unavailable to the listener, either because he does not have access to them or because he is obviously incapable of interpreting them; and finally, where the speaker knows of no fact that will prevent the predicted event from occurring. *Id.* at 1026–1027.

From the record it appears that Filloramo bases his fraud claim on two and perhaps all three of these exceptions. To begin with, he alleges that he and Boorman had a fiduciary relationship, which may indeed exist between a stock broker and his client depending on the circumstances surrounding their association. *Moholt v. Dean Whitter Reynolds, Inc.*, 478 F.Supp. 451, 453 (D.D.C.1979), *Avern Trust v. Clarke*, 415 F.2d 1238, 1239–1240 (7th Cir. 1969), *cert. denied*, 397 U.S. 963, 90 S.Ct. 997, 25 L.Ed.2d 255 (1970). Filloramo has testified at deposition that he placed significant trust in Boorman due to his preoccupation with his business, which is relevant to a claim of fiduciary duty. Thus, Filloramo would have had a basis for depending on Boorman to have investigated facts underlying his predictions of future highly lucrative contracts for Johnson Electronics and Megadata, as well as his prediction that profits for Manor Care would decline.

In addition, Filloramo testified that Boorman made at least one of his predictions, concerning Johnson Electronics, based on conversations with the president of that company, to whom Filloramo may not have had access. Filloramo seems to allege in general that Boorman fostered an atmosphere in which he appeared to have knowledge unknown and inaccessible to Filloramo.

Finally, Filloramo has discovered various Johnston Lemon research reports concerning all three companies which, at the least, did not support Boorman's alleged predictions. And, in the case of the report showing that Manor Care did not depend on Medicaid patients for its profitability, this constitutes evidence that Boorman knew a fact which would "prevent the occurrence" of his prediction of a decline in its stock.

Defendants counter that Filloramo was a sophisticated investor, and had access to the same information, and therefore could not have justifiably relied on Boorman's alleged misrepresentations. But this is a fact issue, the resolution of which depends on the relationship between Filloramo and Boorman and their understanding and representations as to the role each would play, and this must be left for the jury to decide.

*Other Common Law Claims*

For the reasons set out above, Filloramo's claims for breach of fiduciary duty and negligent misrepresentation likewise survive summary judgment.

2. The RICO Claim

■ In addition to alleging various "garden variety" forms of fraud, Fillaromo also claims violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* (1982) ("RICO"). His theory is that Boorman and Johnston, Lemon & Co. are "persons" under the statute, that Johnston Lemon is also an "enterprise" thereunder, and that the transactions involving Manor Care, Johnson Electronics and Megadata stocks constituted a "pattern of racketeering activity" suffi-

cient to violate 18 U.S.C. §§ 1962(a), (c) and (d).[1]

### Distinction Between "Person" and "Enterprise"

As a preliminary matter, the Court notes that the definition of "person" under § 1962 easily encompasses both Boorman and Johnston, Lemon, since it includes any individual or entity capable of holding a legal or beneficial interest in property. § 1961(3). Further, Johnston, Lemon is also an "enterprise" under the statutory scheme, since it is a corporation. § 1961(4).

However, the question arises whether the same entity can be both an "enterprise" as well as a "person" (and therefore be held liable) under § 1962. The Court of Appeals has held that under a § 1962(c) claim it may not be, given the language of that section and its underlying congressional policy of punishing those who infiltrate otherwise legitimate businesses and conduct their affairs in an illegal manner. Under § 1962(c), the enterprise is the "victim" or "passive instrument" of the racketeering activity. *Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782, 790–791 (D.C.Cir.1988). In the present case, plaintiff alleges a different scenario—that Johnston, Lemon acted in concert with Boorman to defraud a third person, namely Filloramo.

■ On the other hand, a corporation may be both the "person" and "enterprise" under a § 1962(a) claim, where such corporation is the direct or indirect beneficiary of the racketeering activity. *Id.* at 790. This accords with the facts alleged here, since Johnston, Lemon is accused of acting to recoup its previous $10,000 settlement

with Filloramo, and of seeking to impress Megadata and Johnson Electronics that they should employ Johnston, Lemon's services as their investment banker.

Therefore, the § 1962(c) claim against Johnston, Lemon will be dismissed, while the claims under §§ 1962(a) and (d) will stand as properly pled.

### Pattern of Racketeering Activity

■ The greater difficulty here, of course, is determining whether Filloramo's allegations are sufficient to constitute a "pattern of racketeering activity," as that term is used in § 1962(a). Based on the views expressed in the seminal case of *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), together with subsequent cases that seem to adhere most closely to such views, the Court is persuaded that Filloramo's complaint successfully alleges a "pattern of racketeering" activity and thus is sufficient to state a RICO claim.

Under § 1961(5), a "pattern of racketeering activity" requires at least two acts of racketeering activity, or "predicate acts" as courts have styled them. Filloramo's allegations of securities fraud are sufficient to constitute predicate racketeering acts, under the definition in § 1961(1)(D). The question is whether they are sufficient to constitute a pattern.

For a few courts, the presence of at least two such acts is, alone, sufficient to constitute a pattern. *See e.g. R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1354–55¢ (5th Cir.1988). But this result has been justifiably criticized, *see e.g.* Goldsmith, *Civil RICO Reform: The Basis For Compromise*, 71 Minn.L.Rev. 827, 842, n. 69 and accompanying text (1987), and is clearly

---

**1.** § 1962(a) states: "(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ..., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce...."

§ 1962(c) states: "It shall be unlawful for any person employed by or associated with any en-

terprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

§ 1962(d) states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

contrary to language in *Sedima,* 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14 ("The implication [from the legislative history] is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern'.") Most courts require at least two predicate acts, plus "something more."

On the other hand, some courts in their search for "something more" wrongly add the requirement of multiple "schemes" before they will find a RICO pattern, opining that it is *per se* insufficient to have multiple predicate acts if they are all in furtherance of a single scheme. This overly restrictive view of RICO has likewise been justifiably criticized; not only is it sometimes difficult to determine whether particular activities constitute a single scheme or episode in the first place, *see Roberts v. Smith Barney, Harris Upham & Co.,* 653 F.Supp. 406, 411 (D.Mass.1986), but such a view is logically inconsistent with the statute itself. *United States v. Ianniello,* 808 F.2d 184, 192 (2d Cir.1986) (if at least two schemes are required for a pattern of racketeering activity to exit, then § 1962(b), which proscribes the acquisition of *an* interest in *an* enterprise through a pattern of racketeering activity, would effectively be eliminated).[2]

▪ Therefore, this Court adopts the middle course espoused by most courts: at least two predicate acts will be required to constitute a pattern of racketeering activity, plus "something more," but no attempt will be made to determine whether multiple schemes are alleged. Rather, the analysis will focus on whether the predicate acts satisfy the elements of "pattern" as set out in *Sedima* and developed in subsequent case law.

In particular, the predicate acts must be sufficiently related to each other, and yet sufficiently continuous over time, to constitute a pattern. *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; *Torwest DBC, Inc. v. Dick,* 810 F.2d 925, 928 (10th Cir.

1987); *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). These terms, as their meanings have been developed by the courts, are in a sense opposed. "Relationship" implies that the predicate acts were committed somewhat closely in time to one another, or involve the same victim or same type of misconduct. On the other hand, "continuity" embraces predicate acts occurring at different times or involving different victims, sufficient to raise an implication of ongoing criminal activity, or at least a threat of such activity. *Torwest, supra, Morgan, supra.*

Clearly the predicate acts alleged here are closely related. They involve the same victim, and many of them took place within a few weeks or months of each other. They clearly involve the same type of conduct, and many involve repetition of essentially identical conduct.

The difficulty in the present case involves the closer question whether the acts were sufficiently continuous to create a pattern. As is often the case, the very factors that result in a strong showing of relationship between the predicate acts detract from their continuity: namely, the presence of a single victim, harmed by the same type of conduct. Yet regardless of their close relationship, there is much that distinguishes the predicate acts alleged here.

First, although many of the sales took place within a short time of each other, many others were remote. The first transactions (the major sale of Manor Care and the initial purchases of Johnson Electronics and Megadata) took place in late 1982 and early 1983. The last purchase of Johnson Electronics occurred in August, 1985, over two and a half years later. Second, unlike a typical stock churning case, each separate purchase was itself allegedly induced by a separate fraudulent representation, constituting a separate offense, and resulting in a separate and quantifiable harm. Therefore, the separate transactions were

---

**2.** § 1962(b) states: "(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirect- ly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

significantly distinguishable, for purposes of determining the extent of their continuity. *See Illinois Dept. of Revenue v. Phillips*, 771 F.2d 312, 313 (7th Cir.1985) (allegation that defendant taxpayer sent nine fraudulent sales tax returns to state revenue department over a nine month period, sufficient to state RICO claims); *contrast Winer v. Patterson*, 663 F.Supp. 723, 726 (D.N.H.1987) (although defendant broker allegedly initiated some 200 transactions in investor's account over a nearly five-year period, plaintiff's complaint was based on churning, a "unified" offense, for which no single transaction or limited group of trades constitutes an offense, and therefore no RICO claim was stated).

Therefore, the Court is satisfied that Filloramo has not alleged fraud on a sporadic or isolated basis, *Sedima*, 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14, but has succeeded in alleging predicate acts that were sufficiently continuous and ongoing to satisfy the requirement of a pattern as developed by courts that most closely follow *Sedima*.

Nonetheless, having said this, it would be disingenuous not to observe that this case seems a most unlikely one to support a RICO claim, and at least one other court appears to hold that it would not. In a case quite similar to this, a stockbroker engaged in "churning and manipulation" of plaintiff's account over a period of twenty two months, *Roberts* 653 F.Supp. at 412, which included misleading statements about the trades he executed and the state of plaintiffs' accounts. The court found this insufficient to state a RICO claim, but not, like the court in *Winer supra*, because the alleged predicate acts were insufficient by themselves or in limited groups to constitute separate offenses. Rather the court reasoned, contrary to the finding of this Court, that plaintiff failed to allege the continuity prong required to establish a pattern of racketeering activity.

The *Roberts* court arrived at its holding based on essentially the same factors that make the present case such an unlikely RICO candidate:

The Roberts are the only victims of the alleged scheme. [Because of their relationship, the court regarded them as a single victim.] The sole participant was a single broker at Smith Barney. The purpose and result of the alleged activity was quite specific, to defraud these plaintiffs, and the alleged method of commission was at all times the same, the churning and manipulation of their trading accounts. And while the plaintiffs allege numerous criminal acts by Smith Barney, those acts all arose out of a single contractual transaction, the Roberts' authorization of Smith Barney to trade their accounts. Finally, there are no allegations that this activity is likely to occur in other contexts, or that it will continue to be a threat to society. Nothing in the complaint suggests that the defendant, Smith Barney, regularly engaged in criminal activities. The only factor that favors treating Smith Barney's activities as a pattern is that the alleged activity continued for twenty-two months. However, time alone does not transform Smith Barney's acts into separate, continuous activities. *Roberts, supra* (footnote omitted).

While the court in *Roberts* reaches a conclusion that frankly seems more sensible than the one reached here, sensibility is not a hallmark of the case law under RICO. *See Sedima*, 473 U.S. at 500, 105 S.Ct. at 3287 ("We nonetheless recognize that, in its private civil version, RICO is evolving into something quite different from the original conception of its enactors"). It appears to this court that the reasons relied on for dismissing the RICO claim in *Roberts* were not properly considered under the law as it stands.

First, the fact there was only one participant in the scheme is not a proper basis for dismissal; the statute as written specifically proscribes racketeering activity by "any person," which definition includes "any individual." § 1961(3).

Secondly, the fact that the alleged method of commission of the predicate acts was, in some sense, always the same (i.e., the churning and manipulation of the Roberts'

accounts) or that the acts all evolved out of a single transaction (the Roberts' authorization of Smith Barney to trade in their accounts) seems to detract very little from their continuity. To the contrary, the presence of such factors seems entirely compatible with that notion, especially when the predicate acts themselves constituted separate injuries to plaintiff, and continued to occur as they did in *Roberts*, over a period of twenty-two months.

Further, the *Roberts* court's observation that there were no allegations that the alleged activity was likely to occur in other contexts, or that it would continue to be a threat to society, is wrongly emphasized. Requiring such an allegation seems to come very close to requiring plaintiff to allege more than one scheme, which should not be required to show a pattern. *See supra* pp. 523–24.

Finally, given that there was a single victim and that the purpose and result of the scheme were quite specific, does not imply lack of continuity. Just as § 1962(b) shows that a pattern of racketeering activity does not require more than one scheme, *see supra* pp. 523–24, it also shows that a pattern can consist of a single specific purpose (acquiring or maintaining any interest or control in an enterprise) directed against a single victim (the enterprise itself).

It might be thought that by retreating into arguments of legislative policy, this Court could find a basis for dismissing Filloramo's RICO claim, but *Sedima* appears to have foreclosed this. For example, it might be argued that the definition of "pattern of racketeering activity" as used in § 1962(a) or (c), especially when those sections are applied to respected businesses in respectable professions, and that therefore they require more than a single victim of a single scheme. But no language in the statute distinguishes these situations, and the Supreme Court has refused to apply such a gloss. *See Sedima* at 499, 105 S.Ct. at 3286. ("The fact that [Civil RICO] is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is

hardly a sufficient reason for assuming that the provision is being misconstrued".)

The *Roberts* Court reasoned that Congress did not intend RICO to reach garden variety securities fraud, noting that the Supreme Court has suggested that wire, mail and securities fraud are unique among the predicate acts covered by the statute. 653 F.Supp. at 413. But what the Supreme Court said in *Sedima* was, "The 'extraordinary' uses to which Civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of pattern'." 473 U.S. at 500, 105 S.Ct. at 3287. This does not imply that the concept of "pattern," and particularly "continuity," should somehow be altered where such acts form the predicate, and nowhere did the Supreme Court explicitly say that it should. To the contrary, *Sedima* stands for the proposition that despite the fact that 40% of civil RICO cases involved securities fraud, according to one study at the time, courts are not to devise methods for restricting the scope of RICO that are not contained in the statute itself. Rather, "its correction must lie with Congress." *Id.* at 499, 105 S.Ct. at 3287.

### 3. The Statute of Limitations

This issue has not been adequately briefed and supported by evidence, and therefore the Court withholds ruling for the present. It appears that this issue may be dispositive of the federal securities law claim, but two issues need to be addressed by the parties first, *see* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725 (3d ed. 1983) (parties normally should be notified when Court intends to rely for decision on legal grounds other than those briefed and argued):

(1) Whether each transaction should be analyzed separately for statute of limitations purposes, so that the more recent purchases by Filloramo of Megadata and Johnson Electronics may fall within the limitation period, while the purchase of

those two stocks and the sale of Manor Care occurring more remotely in time would no longer be actionable; conversely, whether the "continuing tort" doctrine, or some other doctrine, requires that all transactions are actionable provided any one of them occurred within the statutory period. *See* 1 S. Speiser, C. Krawse & A. Gans, *The American Law of Torts* § 5:27 (1983), and cases cited therein;

(2) At what point Filloramo sustained injury sufficient to begin the limitation period running. *See Fitzgerald v. Seamans*, 553 F.2d 220, 227 (D.C.Cir.1977).

In addition, briefing is also ordered on the statute of limitations issue regarding Filloramo's common law claims for fraud, breach of fiduciary duty and negligent misrepresentation. In particular, the following issues should be addressed:

(1) Whether the limitation period applicable to the fraud and negligent misrepresentation claims is the three year period contained in 4 D.C. Code Ann. § 12–301(8) (1981).

(2) Whether Filloramo's action for fraud and negligent misrepresentation based on transactions occurring prior to May 29, 1984 is barred.

(3) Whether the doctrine of laches applies to Filloramo's claim for breach of fiduciary duty.

(4) Whether Filloramo's action for breach of fiduciary duty is barred in whole or in part.

It is therefore,

ORDERED, that defendants' motion for summary judgment as to plaintiff's claim under 18 U.S.C. § 1962(c) is granted, and it is further

ORDERED, that defendants' motion for summary judgment on the merits as to plaintiff's federal securities law claim, and common law claims, and claims under 18 U.S.C. §§ 1962(a) and (d) is denied, and it is further

ORDERED, that the parties shall more thoroughly brief the statute of limitations issues in this case as set out above, with defendants filing a supplemental memorandum by August 8, 1988, plaintiff filing a supplemental memorandum by August 17, 1988, and defendants filing a reply, if any, by August 24, 1988. These dates shall not be extended absent an extraordinary showing.

SO ORDERED.