**FLEET CREDIT CORPORATION**

v.

**Anthony SION, Lillian Jaeger Sion, SEI, Inc., Katy Industries, Inc.**

Civ. A. No. 87–0639 L.

United States District Court,
D. Rhode Island.

Nov. 16, 1988.

Elizabeth B. Burnett, Peter A. Biagetti and John C. Plotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, Mass., Bruce W. Gladstone, Cameron & Mittleman, Providence, R.I., for plaintiff.

Marc DeSisto, Carroll, Kelly & Murphy, Providence, R.I., for Katy Ind.

Mark A. McSally, Taft & McSally, Cranston, R.I., for SEI, Inc.

Matthew F. Medeiros, Flanders & Medeiros, Providence, R.I., for Lillian Sion.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is presently before the Court on the separate motions to dismiss of defendants Lillian Sion, SEI, Inc. ("SEI"), and Katy Industries, Inc. ("Katy"). Failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), failure to satisfy the strictures of Fed.R. Civ.P. 9(b), and lack of federal subject matter jurisdiction are among the rationales supporting the instant motions.

Fleet Credit Corporation ("Fleet") brought this action after allegedly having been bilked out of millions of dollars by Anthony Sion and his wife Lillian under loans that spanned a period of seven years. Fleet claims that Sion, with some aid from his wife, fraudulently induced Fleet to loan money to two jewelry companies—Federal Chain Company ("Federal Chain") and Baroness, Inc. ("Baroness"), and then systematically looted the two debtor companies. Federal Chain is wholly owned by Anthony Sion and Lillian Sion, and Baroness is owned solely by Anthony Sion. Fleet maintains that Anthony Sion looted Federal Chain and Baroness by using company money for personal expenses and by transferring company assets to two other companies. These two other companies are SEI, an entity created by Anthony Sion, and Katy, a Delaware corporation for which Anthony Sion went to work after the demise of Federal Chain and Baroness.

Fleet alleges that Anthony Sion's bank bilking scheme was carried out through a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961 et seq. It further alleges that Lillian Sion also violated RICO, and Fleet has brought a treble damages action pursuant to RICO's private right of action provision, 18 U.S.C. § 1964(c). Having reached federal court on this claim, Fleet seeks to have this Court exercise pendent jurisdiction over a litany of state common law contract and fraud claims against Anthony Sion and Lillian Sion, and pendent party jurisdiction over similar state law claims against SEI and Katy.

This Court finds that the course of conduct described by Fleet constitutes a run of the mill, contract fraud scheme. It is by no means the type of activity associated with organized crime and evincing a continuing threat of criminal activity that Congress sought to attack by enacting RICO. In recent years, civil RICO has been used to convert ordinary state law contract and contract fraud actions into federal treble damages, racketeering actions. This conversion has been due to the overbreadth of RICO's statutory language and contravenes the legislative intent underlying the Act. Such a result cannot be attained here because while the Sions are alleged to have committed a number of predicate RICO acts, Fleet has failed to show that these stoop to the level of constituting a pattern of racketeering activity under 18 U.S.C. § 1961(5). Therefore, in accordance with Congressional intent and in fidelity to the statutory language, this Court finds that a cause of action for a RICO violation has not been stated against Lillian Sion.

Finally, this Court refuses to exercise pendent party jurisdiction in the instant matter because no federal cause of action exists. Even if Fleet had pleaded a valid RICO claim, this Court's discretionary exercise of pendent party jurisdiction would still be inappropriate. Therefore, defendants Lillian Sion, SEI, and Katy must be dismissed from the present action.

## BACKGROUND

The facts in this case, as alleged by Fleet in its Amended Complaint, are as follows.

From 1978 to 1983 Fleet loaned money to two jewelry manufacturing companies controlled by Anthony Sion. These companies were Federal Chain and Baroness. Anthony Sion and his wife Lillian Sion were the sole shareholders of Federal Chain from 1977–1985, and Anthony Sion was the sole shareholder of Baroness. On August 25, 1985, due to non-payment of the loans and pursuant to the terms of several financing and security agreements, Federal Chain and Baroness executed voluntary possessory papers and Fleet took possession of the remaining assets of the two companies. Fleet liquidated the Federal Chain and Baroness assets, but was left with an outstanding deficiency of $7,531,495 in principal on its loans.

The scenario under which Anthony Sion induced Fleet to loan millions of dollars to his two companies is rather involved. In 1978 Fleet extended a line of credit to both Federal Chain and Baroness of up to 80% of their accounts receivable up to a limit of $4,000,000 at any one point with respect to Federal Chain, and $700,000 at any one point with respect to Baroness (Baroness's credit line was also based on its inventory). In 1980, Fleet and Federal Chain entered into another loan agreement under which Fleet agreed to loan $8,000,000. Then in 1983, Federal Chain and Baroness jointly and severally executed a term promissory note to the order of Fleet in the principal amount of $5,000,000. At the same time, Federal Chain, Baroness, Anthony Sion and Lillian Sion agreed to amend the preexisting agreements so as to lower the total amount Fleet agreed to loan Federal Chain and Baroness under those earlier agreements. Fleet claims that it loaned a total of $8,872,518.66 in principal, $7,531,495 of which it has yet to recover.

As collateral for all these loans, Fleet took a security interest in Federal Chain's and Baroness's accounts receivable, general intangibles, inventory, machinery, equipment and fixtures, and all proceeds thereof. In addition, Fleet induced Anthony Sion and Lillian Sion to execute a series of personal guaranties of Federal Chain's and Baroness's debts to Fleet. Moreover, Fleet secured cross-guaranties by and between Federal Chain and Baroness as to their debts with Fleet. Finally, both Federal Chain and Baroness agreed to make a number of representations to Fleet. These were generally in the nature of keeping Fleet informed of the financial status of the companies through periodic reports, and promising not to remove, transfer or destroy collateral.

Fleet claims that Anthony Sion, with the occasional assistance of his wife Lillian, systematically looted Federal Chain and Baroness and thereby defrauded Fleet out of more than seven million dollars. Fleet alleges that Anthony Sion deceived Fleet by misrepresenting Federal Chain's and Baroness's assets and by making numerous other false statements and omissions in his reports to Fleet. Among these falsehoods, Fleet contends that Anthony Sion claimed as business expenses of Federal Chain and Baroness, money that was spent on the following items: improvements to the residences of Anthony Sion and his family members such as construction of a swimming pool, tennis court, and wharf; the operation of the Atlantic Restaurant in Newport, Rhode Island; personal travel expenses; sports cars; designer dresses; membership dues at several country clubs; and purchases from the toy store "Child World", among other expenditures. Moreover, Fleet alleges that Anthony Sion wrongfully transferred five Federal Chain automobiles to Lillian Sion, surreptitiously removed production machinery from Federal Chain and Baroness, and purloined other Fleet collateral.

In April of 1985, Anthony Sion incorporated SEI and established himself as its President, Vice President, Secretary and Treasurer. Fleet claims that Anthony Sion fraudently conveyed a valuable portion of Baroness and Federal Chain equipment and inventory to SEI.

On August 26, 1985, Katy Industries employed Anthony Sion and other Baroness personnel. Furthermore, Fleet claims that Anthony Sion diverted to Katy equipment and cost books from Federal Chain and Baroness, as well as a lucrative contract concerning the "Sears Jewelry Line".

Fleet's allegations paint a sordid picture of a man who, with minimal help from his wife, hoodwinked a seemingly sophisticated bank for over seven years and cheated it out of more than seven million dollars. While this activity, if true, is certainly reprehensible, it merely constitutes grounds for an ordinary common law contract fraud action of the sort normally entertained in state court. In fact, Fleet has filed suit in Rhode Island Superior Court. However, perhaps in an effort to get its case into federal court, and to plumb the gold mine of treble damages, Fleet has alleged that Anthony Sion and his wife Lillian injured it through a pattern of racketeering activity in violation of RICO.

■ Fleet alleges that Anthony Sion participated in the affairs of Federal Chain and Baroness through a pattern of racketeering activity in violation of § 1962(c). Fleet apparently contends that this racketeering activity included causing Federal Chain and Baroness to borrow money on false pretenses, diverting loan money to his personal use, diverting property pledged as collateral to SEI, and diverting to SEI and Katy, Federal Chain and Baroness property constituting the proceeds of Fleet's loans. Of course, none of these activities constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Fleet also maintains that Anthony Sion committed multiple acts of mail fraud in violation of 18 U.S.C. § 1341 between 1978 and 1985. Violation of § 1341 does constitute "racketeering activity" within the meaning of § 1961(1). Finally, Fleet claims that Anthony Sion invested money derived from his pattern of racketeering activity in SEI and Katy in violation of § 1962(a), and that he conspired to violate provisions of §§ 1962(a) and (c) in violation of § 1962(d).

As to Lillian Sion, Fleet alleges that she agreed with her husband "to participate in some or all of the alleged acts of racketeering and to participate in the conduct of Federal Chain and Baroness by committing two or more predicate acts." Fleet's Amended Complaint, paragraph 64. More specifically, Fleet claims Lillian Sion's participation included but was not limited to signing and causing to be mailed many of the ninety-five checks identified in a separate exhibit. Fleet apparently seeks to have this Court infer that such mailings constituted mail fraud under 18 U.S.C. § 1341 and were thus racketeering activity under 18 U.S.C. § 1961; however, Fleet does not explicitly state this in its Amended Complaint. The ninety-five checks were drawn on a Federal Chain and a Baroness checking account between 1980 and 1985 and were allegedly used to pay for personal expenses. Most of these checks were used to pay a travel agency and various credit card companies. Based on the above-described activity, Fleet maintains that Lillian Sion violated RICO § 1962(c) and § 1962(d).

Based on Anthony and Lillian Sion's alleged violation of § 1962(c) and § 1962(d), Fleet seeks treble damages of $22,594,486 plus annual interest and costs and attorneys fees pursuant to 18 U.S.C. § 1964(a) [1] and 18 U.S.C. § 1964(c).[2]

Turning to a history of the instant litigation, Fleet initially filed an eleven count complaint against Anthony Sion, Lillian Sion, SEI and Katy on December 11, 1987. Count I of this complaint, a RICO claim against *only* Anthony Sion, served as the basis for federal court jurisdiction over the case. The remaining ten counts, were state causes of action against Anthony Sion and/or various combinations of the three other defendants. A number of these other counts did not involve Anthony Sion at all; however, Fleet claimed that the Court should exercise pendent party jurisdiction over the remaining state law claims.

On January 4, 1988, Lillian Sion filed a motion to dismiss on the ground that this Court lacked jurisdiction over all the claims

1. 18 U.S.C. § 1964(a) grants federal district courts the power to restrain § 1962 violations.

2. 18 U.S.C. § 1964(c) provides:
    Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

against her. Fleet filed an objection to the motion arguing that federal pendent party jurisdiction exists. Then on April 8, 1988, Katy filed a motion to dismiss based on lack of subject matter jurisdiction, (in part, Katy claimed that the RICO claim against Anthony Sion was time-barred).

On May 6, 1988, Fleet filed an Amended Complaint in which it added only the above-outlined RICO claims against Lillian Sion. In response, on May 23, 1988, Lillian Sion moved to dismiss the Amended Complaint on the grounds that it fails to satisfy the particularity requirements of Fed.R.Civ.P. 9(b), fails to state a RICO claim under § 1962(c) or § 1962(d) and therefore should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), and that the Court should not exercise pendent party jurisdiction. Not to be left out of the fray, SEI filed a motion to dismiss, on August 3, 1988, for lack of federal jurisdiction over the state law allegations against it.

Fleet objected to Lillian Sion's, SEI's, and Katy's motions to dismiss and the the matter was scheduled for oral argument. On September 1, 1988, this Court heard oral argument as to whether the Amended Complaint demonstrated a RICO violation by Lillian Sion, whether it satisfied Fed.R. Civ.P. 9(b), and whether the Amended Complaint should be dismissed as to Lillian Sion, SEI, and Katy for lack of subject matter jurisdiction. This Court took the matter under advisement, and it is now in order for decision.

### DISCUSSION

#### I. RICO

RICO contains broad language that could easily be interpreted to provide a private right of action for many activities that Congress never intended to so reach. To avoid this overinclusive danger, the Supreme Court has suggested that the judiciary develop a meaningful definition of the RICO "pattern" element found in § 1962. However, since the Supreme Court has directed that the courts may not contravene the express language contained in RICO because any change in statutory language

can come only from Congress, the courts must adhere to the Act's plain language.

Various approaches have been employed by appellate courts in order to limit the reach of private civil RICO actions. The First Circuit has adopted a middle approach which considers a number of factors in determining whether a given course of conduct constitutes a "pattern of racketeering activity." No one factor is controlling, and any given case is easily susceptible to a broad range of different interpretations under this approach. Therefore, it is crucial that a judge making a "pattern" determination, carefully determine the legislative intent underlying RICO to properly evaluate whether a particular transaction should be considered a "pattern of racketeering activity" for RICO purposes. In short, this Court must endeavor to show fidelity to the legislative intent supporting RICO while operating within the constraints of the statutory language.

#### A. *Legislative Intent Underlying RICO*

In 1970, Congress passed RICO as Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941. As the legislative history of Title IX, and of similar bills proposed in the years preceding RICO's eventual enactment makes clear, the primary purpose of RICO was to stop organized crime from infiltrating and corrupting legitimate businesses. *United States v. Turkette*, 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 513–17, 105 S.Ct. 3275, 3298–3301, 87 L.Ed.2d 346 (1985) (Marshall, J., dissenting).

Senator Hruska was a co-sponsor of the Corrupt Organizations Act of 1969 which eventually was enacted as the RICO law. This was not the first bill that the Senator had introduced in his effort to protect legitimate businesses from infiltration by organized crime, and his statements concerning the RICO predecessor bills are helpful in defining the legislative intent supporting RICO itself. In discussing one of these earlier bills, a bill proposed in 1967, Senator

Hruska identified four ways in which the mob corrupts and gains control of legitimate businesses. These are:

First. Investing concealed profits acquired from gambling and other illegal enterprises.

Second. Accepting business interests in payment of the owner's gambling debts.

Third. Foreclosing on usurious loans.

Fourth. Using various forms of extortion. [S. 2048, 90th Cong., 1st Sess., 113 Cong.Rec. 17998–17999.]

*Sedima,* 473 U.S. at 514–15, 105 S.Ct. at 3299 (Marshall, J., dissenting). Congress enacted subsections a and b of § 1962 to eliminate these four tactics.

In 1969, Senator McClellan introduced the Organized Crime Control Act, S. 30, 91st Cong., 1st Sess., and Senator Hruska introduced the Criminal Activities Profits Act, S. 1623, 91st Cong., 1st Sess., which included many provisions from his earlier bill. *Id.* Senator Hruska stated that the purpose of this RICO ancestor was to attack "the economic power of organized crime and its exercise of unfair competition with honest businessmen...." *Id.* (emphasis deleted).

After more legislative activity, Senators McClellan and Hruska jointly introduced S. 1861, the Corrupt Organizations Act of 1969, 91st Cong., 1st Sess.; and it was incorporated by amendment to the Organized Crime Control Act, S. 30. *Id.* at 516, 105 S.Ct. at 3300. S. 1861 became Title IX, "Racketeer Influenced and Corrupt Organizations," and was reported on by the Senate Judiciary Committee in December of 1969. The Committee Report stated that Title IX, RICO, "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." *Id.* at 517, 105 S.Ct. at 3300. (quoting S.Rep. No. 91–617, p. 76 (1969)).

The Supreme Court has noted "that the legislative history forcefully supports the view that the major purpose of [RICO] is to address the infiltration of legitimate business by organized crime." *Turkette,* 452 U.S. at 591, 101 S.Ct. at 2533. In fact, in a footnote to *Turkette* the Court supported its analysis of Congressional intent by citing the following senatorial statements:

116 Cong.Rec. 591 (1970) (remarks of Sen. McClellan) ("title IX is aimed at removing organized crime from our legitimate organizations"); id., at 602 (remarks of Sen. Hruska) ("Title IX of this act is designed to remove the influence of organized crime from legitimate business by attacking its property interests and by removing its members from control of legitimate businesses which have been acquired or operated by unlawful racketeering methods"); id., at 607 (remarks of Sen. Byrd) ("alarming expansion into the field of legitimate business"); id., at 953 (remarks of Sen. Thurmond) ("racketeers ... gaining inroads into legitimate business"); id., at 845 (remarks of Sen. Kennedy) ("title IX ... may provide us with new tools to prevent organized crime from taking over legitimate businesses and activities"); S.Rep. No. 91–617, p. 76 (1969).

*Id.* at 591, n. 13, 101 S.Ct. at 2532, n. 13.

As demonstrated by the legislative history, the focus of RICO was to protect legitimate businesses from corruption and infiltration by organized crime. At the heart of RICO is § 1962[3], the prohibitions of

---

**3.** 18 U.S.C. § 1962, Prohibited Activities, provides in part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt ... to use or invest [such income in any enterprise that affects interstate or foreign commerce].

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise [that affects interstate or foreign commerce].

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

which were designed to punish the types of mob infiltration techniques described by Senator Hruska in 1967. Thus, § 1962(a) prohibits investing dirty money—that is, money derived through a pattern of racketeering activity or collection of an unlawful debt—in a legitimate business. Section § 1962(b) criminalizes acquiring or maintaining an interest in or control of a legitimate business through a pattern of racketeering or the collection of an unlawful debt. These two sections were designed to protect against the infiltration of legitimate businesses. Section 1962(c), on the other hand, was intended to be used where the damage was already done, and a legitimate business had already been corrupted. In short, the major purpose of RICO was to protect legitimate businesses from the mob through the two workhorses of §§ 1962(a) and (b), but if the government arrived on the scene too late, § 1962(c) would serve to catch those criminals who slipped through the cracks.

## B. *RICO As Applied*

In practice, RICO has been turned on its head and § 1962(c) has become the key prohibition. While, as indicated above, Congress intended that RICO protect legitimate businesses from organized crime, instead RICO has been most often used to attack the mob directly.

The Supreme Court recognized and approved the use of RICO as a direct weapon against organized crime in its landmark *Turkette* ruling. The issue before the Court in *Turkette* was whether a RICO conviction could be sustained based on § 1962(c) and § 1962(d) where the RICO "enterprise" was entirely illegitimate and no legitimate business was involved. The Court held that "RICO is equally applicable to a criminal enterprise that has no legitimate dimension." 452 U.S. at 591, 101 S.Ct. at 2533. Writing for the majority, Justice White reasoned:

> In view of the purposes and goals of the Act, as well as the language of the statute, we are unpersuaded that Congress nevertheless confined the reach of the law to only narrow aspects of organized crime, and, in particular, under RICO, *only* the infiltration of legitimate business.

> This is not to gainsay that the legislative history forcefully supports the view that the major purpose of Title IX is to address the infiltration of legitimate business by organized crime. The point is made time and again during the debates and in the hearings before the House and Senate. But none of these statements requires the negative inference that Title IX did not reach the activities of enterprises organized and existing for criminal purposes.

*Id.* at 590–91, 101 S.Ct. at 2532 (citations omitted).

Three major rationales underly the *Turkette* decision. First, permitting RICO attacks on wholly criminal organizations furthers Congress's goal of eliminating mob corruption of legitimate businesses. As Justice White observed, "[u]ndoubtedly, the infiltration of legitimate businesses was of great concern, but the means provided to prevent that infiltration plainly included striking at the source of the problem." *Id.* at 592–93, 101 S.Ct. at 2533. In short, if the mob is eliminated, or at least weakened, it cannot infiltrate legitimate businesses as readily. Second, to rule otherwise would insulate wholly criminal enterprises from RICO liability. It would be unseemly for mobsters who scrupulously engage in only illegitimate activity to "be immune from prosecution under RICO so long as the association did not deviate from the criminal path." *Id.* at 590, 101 S.Ct. at 2532. Finally, the fact that "a wholly criminal enterprise comes within the ambit of the statute does not mean that a 'pattern of racketeering activity' is an 'enterprise.'" *Id.* at 583, 101 S.Ct. at 2532.

## C. *Private Treble Damages: § 1964(c)*

As noted, RICO contains § 1964(c) which permits any person injured in his business or property as a result of a violation of § 1962 to recover treble damages plus litigation costs and attorneys fees. Little legislative history concerning this provision exists. *See generally, Sedima, S.P.R.L. v.*

*Imrex Co., Inc.*, 741 F.2d 482 at 488–93 (2d Cir.1984) *rev'd* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Yet, it appears that § 1964(c) is modelled after the antitrust private right of action and that it "slipped quietly into the statute" with only very mild concern as to possible abuse expressed by three Congressmen. *Sedima*, 473 U.S. at 498, 105 S.Ct. at 3286; *Sedima*, 473 U.S. at 518–19, 105 S.Ct. at 3301–02 (Marshall, J., dissenting). Therefore, the Congressional intent supporting § 1964(c) is very unclear.

It cannot be that § 1964(c) was intended by Congress to encourage private enforcement of RICO in a manner similar to that seen in the antitrust and securities fields. *See generally J.I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed. 2d 423 (1964) ("Private enforcement of the proxy rules provides a necessary supplement to [Securities and Exchange] Commission action."). The reason that § 1964(c) could not have been designed to produce "private attorney generals" to challenge mob influence over legitimate businesses in civil suits is that these private attorney generals would most certainly have a very short life expectancy. Certainly, Congress could not have believed that § 1964(c) would encourage a private individual, standing alone, to seek to squeeze treble damages out of a sprawling organized crime syndicate through a civil suit. While this much is clear, it remains a mystery why Congress promulgated the private right of action.

Recently, the Supreme Court recognized "that, in its private civil version, RICO is evolving into something quite different from the original conception of its enactors." *Sedima* 473 U.S. at 500, 105 S.Ct. at 3287. In fact, private RICO actions are being brought almost solely against respected businesses, rather than mobsters. *Id.* at 499, 105 S.Ct. at 3286. In 1985, an American Bar Association task force examined 270 civil RICO cases at the trial level and found that "40% involved securities fraud, 37% common-law fraud in a commercial or business setting, and only 9% 'allegations of criminal activity of a type generally associated with professional crimi-

nals.'" *Id.* at 499 n. 16, 105 S.Ct. at 3286 n. 16 (citing Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 55 (1985)).

RICO has gone from being a law intended to protect legitimate businesses from infiltration by organized crime to a law used by private plaintiffs to drag traditional state law fraud actions into federal court and to threaten securities and contract fraud defendants with the very real spectre of paying treble damages and being branded racketeers. The statute's tremendous overbreadth is the source of these problems. *See Sedima*, 473 U.S. at 500, 105 S.Ct. at 3287. Furthermore, this overbreadth results from "the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud." *Id.*

The overbreadth problem is dramatically lessened when a government prosecutor determines whether to bring a civil or criminal RICO action. This is because federal prosecutors themselves narrow the range of situations in which RICO charges are brought to the range of activity that Congress intended to reach. *See generally* "RICO Guidelines" as incorporated in the U.S. Attorneys' Manual § 9–110.200 et seq. This Court need not here discuss the propriety and constitutionality of having the executive branch of government act as the policy-maker and crime-definer in interpreting broad criminal statutes.

Justice Marshall discussed the RICO overbreadth problem in his *Sedima* dissent. 473 U.S. at 502, 105 S.Ct. at 3293. He first noted that § 1964(c), in conjunction with § 1962 and § 1961(5) which defines a "pattern of racketeering activity," potentially makes two acts of mail or wire fraud actionable under RICO. Justice Marshall then discussed the inherent problems with § 1964(c) as follows:

The effects of making a mere two instances of mail or wire fraud potentially actionable under civil RICO are staggering, because in recent years the Courts of Appeals have "tolerated an extraordi-

nary expansion of mail and wire fraud statutes to permit federal prosecution for conduct that some had thought was subject only to state criminal and civil law."

...

The only restraining influence on the "inexorable expansion of the mail and wire fraud statutes," has been the prudent use of prosecutorial discretion. Prosecutors simply do not invoke the mail and wire fraud provisions in every case in which a violation of the relevant statute can be proved....

The responsible use of prosecutorial discretion is particularly important with respect to criminal RICO prosecutions....

.   .   .   .   .

In the context of civil RICO, however, the restraining influence of prosecutors is completely absent. Unlike the government, private litigants have no reason to avoid displacing state common-law remedies. Quite to the contrary, such litigants, lured by the prospect of treble damages and attorney's fees, have a strong incentive to invoke RICO's provisions whenever they can allege in good faith two instances of mail or wire fraud. Then the defendant, facing a tremendous financial exposure in addition to the threat of being labeled a "racketeer," will have a strong interest in settling the dispute.

*Id.* at 502–04, 105 S.Ct. at 3293–94 (citations omitted).

The problem facing the courts, then, is how to properly limit private civil RICO actions so as to conform to the Congressional intent of prohibiting organized crime from corrupting legitimate businesses, where the statutory language could easily be read to permit racketeering actions seeking treble damages against respectable businessmen over ordinary contract fraud disputes. A number of different theories for limiting RICO have been suggested. First, some initially argued that RICO should only apply when evidence exists showing that a defendant is a member of organized crime. This has been rejected.

*See e.g. United States v. Mandel,* 415 F.Supp. 997 (D.Md.1976).

The Second Circuit in *Sedima* attempted to limit civil RICO by requiring a plaintiff to show a "racketeering injury"—an injury caused by an activity which RICO was designed to deter, distinct from that caused by the predicate acts themselves—and to prove that defendants had already been convicted of the predicate acts. *Sedima,* 741 F.2d 482. In a watershed, 5–4 decision, the Supreme Court rejected the Second Circuit's approach; however, the Court stated that it understood "the [Court of Appeal's] concern over the consequences of an unbridled reading of the statute." *Sedima,* 473 U.S. at 481, 105 S.Ct. at 3277.

Justice White, writing for the *Sedima* majority observed:

It is true that civil actions under the statute are being brought almost solely against [ordinary businessmen], rather than against the archetypal, intimidating mobster. Yet this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.

We nonetheless recognize that, in its private civil version, RICO is evolving into something quite different from the original conception of its enactors.... The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern."

473 U.S. at 499–500, 105 S.Ct. at 3286–3287 (citations omitted). One may draw several conclusions from Justice White's statement. The first is that Congress may wish to reexamine several aspects of RICO. Recently, legislators have introduced two bills designed "to reform the misused civil provisions of the Federal Racketeer Influenced

and Corrupt Organizations Act." 133 Cong.Rec. H6616–01 (July 23, 1987) (Statement of Rep. Boucher referring to H.R. 2983, 100th Cong. 1st Sess. (1987), and S. 1523, 100th Cong., 1st Sess. (1987).).

At first glance, the Supreme Court seems to be telling the judiciary to use the RICO "pattern" element to limit civil RICO, but not to go so far as to bring civil RICO in line with the intentions of its enactors. Clearly this cannot be what the Court is saying. Upon further analysis, it becomes apparent that the *Sedima* Court is instructing the lower courts to develop a meaningful concept of "pattern" so as to conform civil RICO as much as possible to the intent of Congress, but not to go so far as to do violence to the plain language of the statute. This, then, is the task of the courts, to limit civil RICO as much as possible in order to conform to the will of Congress by developing a meaningful concept of "pattern," while not transgressing the separation of powers doctrine by effectively rewriting Title IX. Phrased another way, the courts need to craft a workable theory of what is a legitimate civil RICO action in order to rein in Title IX so as to bring RICO back in line with Congressional intent.

### D. The Pattern Requirement

For a RICO action to lie, § 1962 requires that the alleged violation be perpetrated through a "pattern of racketeering activity" or the "collection of an unlawful debt." 18 U.S.C. § 1962. Only the pattern requirement is of interest in the instant case. Congress created the pattern requirement for the following reasons:

Rather than attempt to define "organized crime" and make membership therein unlawful, a task which would undoubtedly have been impossible and probably unconstitutional, Congress defined an unlawful pattern of racketeering activity in terms of the types of crimes and behavior commonly engaged in by organized crime in attempts to seize interests in legitimate businesses. In so defining the offense, Congress clearly understood that while the statute would apply primarily to members of organized crime, the statute could not be applied exclusively to members of organized crime.

*United States v. Mandel,* 415 F.Supp. 997, 1019 (D.Md.1976) (The Court refused to limit RICO prosecutions to cases involving a link to organized crime.). Therefore, while RICO is directed at organized criminal infiltration of legitimate businesses, it is necessarily overinclusive. As discussed above, this overbreadth is limited through prosecutorial discretion in cases brought by the government, but in private actions a proper construction of the pattern requirement is all that constrains plaintiffs to obey Congressional intent.

Title IX dictates that a "pattern of racketeering activity requires at least two acts of racketeering activity" that occur within ten years of each other. 18 U.S.C. § 1961(5). Section 1961(1) defines "racketeering activity" itself as meaning, among other things, any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud), and 18 U.S.C. § 1343 (relating to wire fraud). 18 U.S.C. § 1961(1). Therefore, it is technically possible for two fraudulent mailings (mailing two letters) to constitute a "pattern of racketeering activity." However, through the now famous footnote 14 of *Sedima,* the Supreme Court has circumscribed the potentially broad reach of the § 1961(5) definition.

The Supreme Court observed:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate

business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91-617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.*, at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening. "[C]riminal conduct forms a pattern if it embraces criminal acts that have. the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3775(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789 [95 S.Ct. 1284, 1295, 43 L.Ed.2d 666] (1975).

*Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. Three points from footnote 14 should be highlighted. First, while a pattern requires at least two predicate acts, two predicate acts are not equivalent to a pattern. Something more is needed. Second, this something more is the "factor of *continuity plus relationship* which combines to produce a pattern." *See Marks v. Pannell Kerr Forster*, 811 F.2d 1108 (7th Cir.1987). Finally, the factors listed in 18 U.S.C. § 3575(e) may be useful in determining whether a pattern exists in a given case. *See e.g. Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986) and *Roberts v. Smith Barney, Harris Upham & Co., Inc.*, 653 F.Supp. 406 (D.Mass.1986) (While both courts list "pattern" factors mentioned in footnote 14 of *Sedima*, nei-

ther explicitly states that these come directly from 18 U.S.C. § 3575(e).).

A number of lower courts have accepted the Supreme Court's invitation in *Sedima* to "develop a meaningful concept of 'pattern,' " as used in the § 1961(5) definition of a "pattern of racketeering activity." *Eastern Corporate Fed. Cred. Union v. Peat, Marwick, Mitchell & Co.*, 639 F.Supp. 1532, 1534 (D.Mass.1986). The various tests employed in different circuits have been detailed in a number of published opinions. *See e.g., Morgan*, 804 F.2d at 974-75; *Winer v. Patterson*, 663 F.Supp. 723, 725 (D.N.H.1987); *Roberts*, 653 F.Supp. at 410-412. At one extreme, the Eighth and Fourth Circuit Courts maintain that when the predicate acts are all committed in furtherance of a single scheme, the acts lack sufficient continuity to satisfy the "pattern" requirement. *See International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 154-55 (4th Cir.1987); *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir. 1986). The Supreme Court has recently granted certiorari to review the Eighth Circuit rule. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 829 F.2d 648 (8th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988). At the other end of the spectrum, the Eleventh and Ninth Circuit Courts have rejected the Eighth Circuit approach and have held that if distinct statutory violations are found, the predicate acts will be considered to be distinct and to form a pattern regardless of whether they arose in only one scheme. *See California Architectural Building Products, Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1469 (9th Cir.1987) (continuity requirement in *Sedima* is mere dictum and contrary to the plain language of § 1961(5)), *cert. denied* —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Bank of America v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir.1986). The Fifth Circuit seems to have vacillated between the two extremes. *Compare R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir.1985) *with Smoky Greenhaw Cotton v. Merrill Lynch*, 785 F.2d 1274, 1280 n. 7 (5th Cir.1986) *cert. denied* —— U.S. ——, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987).

The First and Seventh Circuits have adopted a middle of the road approach in which the number of schemes is only one of a number of factors considered in determining whether a pattern of racketeering exists. *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 31 (1st Cir.1987); *Morgan*, 804 F.2d at 975; *Winer*, 663 F.Supp. at 725–26. Under this approach, the courts seek to discover whether a given course of conduct has the necessary "continuity plus relationship" to be considered a RICO pattern. *Roeder*, 814 F.2d at 30. It is the factor of continuity plus relationship that presents the danger of ongoing organized criminal behavior that Congress sought to eradicate through RICO. As one First Circuit district judge noted in a pre-*Roeder* opinion, the factor of continuity plus relationship allows the courts to distinguish "repeated criminal activity from multiple acts used to carry out a single transaction—particularly where the predicate acts alleged involve mail fraud." *Eastern Corporate Federal*, 639 F.Supp. at 1534.

In *Roeder*, the First Circuit approvingly cited the multi-factor test used by the Seventh Circuit in its *Morgan* decision. *Roeder*, 814 F.2d at 31. The Court then went on to use the *Morgan* test in reaching its decision that no RICO pattern had been shown. *Id.* at 31. Moreover, several First Circuit district courts have employed the *Morgan* test, or one quite similar, to make "pattern" rulings. *See Winer*, 723 F.Supp. at 726; *Roberts*, 653 F.Supp. at 412.

The *Morgan* Court listed the following factors in making its "pattern" judgment:

> Relevant factors include the [1] number and [2] variety of predicate acts and [3] the length of time over which they were committed, [4] the number of victims, [5] the presence of separate schemes and [6] the occurrence of distinct injuries.

*Morgan*, 804 F.2d at 975 (numbers added). Moreover, the New Hampshire District Court, in a post-*Roeder* decision, further defined the list of pattern factors as follows:

> [The factors] are: (1) the number of independent victims of the alleged activity; (2) the number of participants in the alleged crime; (3) the purpose of the activity; (4) the result of the activity; (5) the method of commission; (6) the number of transactions; (7) whether the scheme is ongoing and open ended; and (8) the duration of the activity.

*Winer*, 663 F.Supp. at 726. These factors are similar to those found in 18 U.S.C. § 3575(e) and cited by the Supreme Court in footnote 14 of *Sedima*. 473 U.S. at 496, 105 S.Ct. at 3285.

Some have criticized the middle approach adopted by the First and Seventh Circuits as amounting to an "I know it when I see it" test. *Morgan*, 804 F.2d at 977. However, these detractors fail to consider that reliance on the legislative intent underlying RICO gives direction and guidance to courts employing the multi-factor test. Significantly, the *Roeder/Morgan* analysis seeks to find the important "continuity plus relationship" factor which justifies the imposition of stiff RICO sanctions and keeps application of RICO faithful to the intent of its enactors, while not doing violence to the explicit language of the statute. Simply put, an inherent tension exists within RICO between the statutory language and its natural consequences, and the legislative intent underlying Title IX. The multi-factor approach acts as a balancing test which assures that the explicit language is not violated in an attempt to be loyal to RICO's purpose.

The parties have cited a number of cases analyzing the pattern requirement under one or another version of the multi-factor test. While many of these cases have factual aspects in common with the instant action, this Court is unaware of any suit that is factually on all fours with the pending matter. As the Seventh Circuit opined in *Morgan*, the multi-factor test is a "factually-oriented standard" that "depends on a case-by-case analysis." 804 F.2d at 977. Since this case is not analogous to any known case in all its material factors, it is necessary for this Court to apply the *Roeder/Morgan* test to the elements of the present dispute while using existing case law and legislative intent as a guide.

■ The facts as alleged in the Amended Complaint describe a bank bilking scenario perpetrated by an ordinary businessman with minimal assistance from his wife. Simply put, Anthony Sion wrongfully induced Fleet to loan money to two corporations that were entirely owned and controlled by him and his wife, improperly spent some of the loan money on personal expenses, transferred collateral out of the debtor corporations, and caused Federal Chain and Baroness to default on their loan obligations thereby leaving Fleet holding a seven million dollar empty bag.

Under either the six-factor test employed in *Morgan* or the slightly expanded test used in *Winer*, the facts alleged by Fleet do not demonstrate a pattern of racketeering activity. Turning first to the *Morgan* factors, Lillian Sion allegedly mailed as many as 95 checks over a five year period and each mailing is said to constitute a predicate act. (1) While the number of these acts is high, (2) the variety is almost non-existent, yet (3) the span of time over which they were committed is lengthy. Basically, Fleet alleges that for several years Lillian Sion paid her bills with Federal Chain and Baroness funds and sent these payments by mail. (4) The number of victims of the Sion scheme is one; Fleet is the only victim. (5) Moreover, no separate schemes existed here; all of the Sions's illegal acts were in furtherance of one scheme—to chisel Fleet out of loan money. (6) Finally, no distinct injuries occurred under the Sion scheme. There was only one injury, and that was the loss of loan money by Fleet and it did not occur until Federal Chain, Baroness, Anthony Sion, and Lillian Sion defaulted on their loan agreements and cross-guaranties. Fleet did not suffer any injury until this point. *Cf. SK Hand Tool Corp. v. Dresser Industries*, 852 F.2d 936, 940 (7th Cir.1988) (Buyer of defendant's hand tool operation could not sustain RICO action alleging defendant had fraudulently induced buyer to purchase company because, among other things, the acts had "no effect" on the buyer "until it decided to buy the division.").

Under the *Winer* test the result is much the same. (1) The number of independent victims is one. (2) The participants in the alleged crime number only two—a husband and wife. (3) The purpose of the activity was to defraud one bank out of money loaned to one couple's wholly-owned companies. (4) The result of the activity was that one bank lost loan money. (5) The method of commission involved the improper disposal of collateral and wrongful use of funds by a husband and wife from their wholly-owned companies. (6) The number of transactions was several, but the loans were cross-guarantied and interrelated. (7) The scheme was ongoing in time but limited by the monetary ceilings placed on the credit extended by Fleet. (8) The duration of activity was seven years.

Of the numerous factors analyzed under both the *Morgan* and *Winer* tests, only the length of time and complexity of the transaction weigh in favor of finding a pattern of racketeering activity. This is insufficient. First, as stated by the First Circuit in *Roeder*, "given the indeterminate nature of the statutory language, and the subtleties inherent in looking for 'continuity plus relationship,' no one characteristic can be considered as controlling in determining whether a pattern exists." 814 F.2d at 31; *see also Morgan*, 804 F.2d at 976. Second, "time alone does not transform" a defendant's activities into a pattern of racketeering activity. *Roberts*, 653 F.Supp. at 412 (no RICO pattern found where acts occurred during a span of 22 months); *Winer*, 663 F.Supp. at 726 (no RICO pattern found where acts occurred during a span of five years); *Zahra v. Charles*, 639 F.Supp. 1405 at 1406–09 (E.D.Mich.1986) (no RICO pattern found where acts occurred during a span of seven years).

■ Finally, mere complexity of a scheme to defraud does not convert it into a pattern of racketeering activity. *Cf. Morgan*, 804 F.2d at 976 (The mere fact of complexity of a transaction did not change the acts into a RICO pattern in a case involving the sale of stock.). Specifically, with regard to Lillian Sion's use of the mails, the First Circuit has found: " 'In today's integrated interstate economy, it is the rare transaction that does not somehow

rely on extensive use of the mails or the telephone.'" *Roeder*, 814 F.2d at 31 (quoting *Eastern Corporate Fed. Credit*, 639 F.Supp. at 1535). Therefore, the courts must be careful not to transform ordinary common law wrongs into RICO offenses merely because the mails were used.

Fleet's allegations describe one continuing bank-bilking scheme carried out against one bank by Anthony Sion and his wife. Clearly, this is not the type of organized criminal syndicate that Congress sought to keep from infiltrating legitimate businesses through enactment of RICO. Moreover, the statutory language does not compel the abusive use of RICO in this instance. Fleet has failed to demonstrate that the Sions's activities constituted a pattern of racketeering activity. Therefore, Lillian Sion's motion to dismiss the RICO claims against her must be granted.

This Court is not condoning the wrongs allegedly committed by the Sions, but RICO is the wrong vehicle for correcting the injury suffered by Fleet. Due to the overbroad language of the statute, RICO is subject to abuse. Yet, civil RICO must not be converted into a cudgel with which to threaten ordinary businessmen with the menace of paying treble damages and of being labelled racketeers. The judiciary must do all that it can, within the limits of its constitutional realm of power, to rein in civil RICO and ensure that the Act is used to combat the corrupting effects of organized crime as Congress intended.

## II. PENDENT PARTY JURISDICTION

Lillian Sion, SEI, and Katy seek to have the state law claims asserted against them dismissed on the ground that this Court lacks subject matter jurisdiction over those causes of action. Fleet responds that this Court should exercise jurisdiction over these claims under the doctrine of pendent party jurisdiction. This Court rejects Fleet's argument and grants the defendants' motions to dismiss the state law claims.

■ The Supreme Court first discussed the doctrine of pendent party jurisdiction in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966). Under this doctrine, in exceptional circumstances, state law claims may be brought against a party not already before a federal court if the state claims are pendent to other claims already before the court. *See generally Amoco Oil Co. v. Local 99, International Brotherhood of Electrical Workers*, 536 F.Supp. 1203 (D.R. I.1982). Pendent party jurisdiction is a "doctrine of discretion, not of plaintiff's right." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

■ This Court refuses to exercise pendent party jurisdiction over the state claims alleged against Lillian Sion, SEI, and Katy for the simple reason that no viable federal claim exists in the instant matter to which the state claims could be pendent. Even assuming for the sake of argument that Fleet had stated a valid RICO claim, this Court would still refuse to exercise pendent party jurisdiction. As discussed herein, the purpose of RICO is to protect legitimate businesses from organized crime, not to provide a federal cause of action for state law contract claims. Due to the overbreadth of the statute as written and in contravention of legislative intent, the federal courts may now be faced with a flood of civil RICO actions stemming from ordinary contract fraud disputes. However, this is no reason to allow non-RICO state law claims against parties not before the Court to wash in on the incoming tide. It may be that some civil RICO abuse is a necessary and uncorrectable evil under the language of the statute; however, the federal judiciary can prevent an exacerbation of this problem by refusing to exercise pendent party jurisdiction.

## CONCLUSION

The course of conduct described by Fleet in its Amended Complaint is not the type of organized criminal activity that Congress sought to prohibit by enacting RICO. Instead, the instant matter appears to be an ordinary common law contract fraud dispute. Since the alleged acts do not constitute a pattern of racketeering activity under Title IX, Lillian Sion's motion to dis-

miss the RICO count against her is granted. Moreover, this Court refuses to exercise pendent party jurisdiction over the remaining state law claims against Lillian Sion, SEI, and Katy, and therefore, their motions to dismiss those claims are also granted. The net result of all this, is that those three defendants hereby are dismissed from this case.

*It is so Ordered.*